**Vincent James LANDANO**

v.

**UNITED STATES DEPARTMENT OF JUSTICE; the Federal Bureau of Investigation, Appellants.**

**No. 91–5161.**

United States Court of Appeals, Third Circuit.

Argued May 20, 1991.

Decided Feb. 11, 1992.

As Amended Feb. 24, 1992.

On Petition for Rehearing April 14, 1992.

---

Stuart M. Gerson, Asst. Atty. Gen., Michael Chertoff, U.S. Atty., Susan C. Cassell, Asst. U.S. Atty., and Leonard Schaitman, John F. Daly (argued), Attys., Appellate Staff, Dept. of Justice, Civ. Div., Washington, D.C., for appellants.

Neil M. Mullin (argued), Smith, Mullin & Kiernan, P.C., West Orange, N.J., for appellee.

Before STAPLETON, SCIRICA and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

In this appeal, we focus on Exemptions 7(C) and 7(D) to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(7)(C)–(D). These exemptions are at the center of a dispute between plaintiff-appellee Vincent Landano and defendants-appellants the Federal Bureau of Investigation and Department of Justice (collectively the "FBI") over Landano's request under the FOIA for documents relating to the 1976 murder of a police officer. Landano was convicted for that murder in a New Jersey state court. The district court granted summary judgment to Landano and ordered the FBI to release information that it had withheld as exempt. The FBI has appealed. We will affirm in part, reverse in part, and remand.

## I.

On August 13, 1976, two gunmen robbed the Hi–Way Check Cashing Service in Kearney, New Jersey. During the course of the robbery, one of the two men shot and killed a police officer, John Snow. The FBI was involved, as were New Jersey state law enforcement officials, in the investigation of the murder. A state grand jury indicted Landano for felony murder, and he was convicted. Landano has always maintained that he did not participate in the robbery and that a man named Victor Forni was the killer of Officer Snow.

Landano attacked his conviction in a federal habeas corpus proceeding asserting that the state prosecutors violated the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by suppressing exculpatory evidence. The United States District Court for the District of New Jersey found merit in this argument and ordered that Landano be retried or released. This court reversed because Landano had not exhausted his state remedies. *Landano v. Rafferty,* 897 F.2d 661 (3d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 46, 112 L.Ed.2d 23 (1990). Landano is apparently pursuing that claim at present in the New Jersey state court system.

Landano has simultaneously sought to obtain FBI files under the FOIA in the hope that they will contain exculpatory evidence or lead to the discovery of such evidence. Landano first sent a letter to the FBI's Newark field office requesting all information pertaining to the murder of Officer Snow. In response, the FBI provided 324 pages of a 726–page file, some of which were redacted. Thereafter, Landano sent the FBI a request for all information on Victor Forni. The FBI released only a portion of that file as well. As to the information in the Snow and the Forni files at issue here, the FBI contended that the release of some of the information would violate the privacy rights of individuals named in those files and that the release of other information would violate confidentiality expressly or impliedly promised by the FBI to persons from whom the FBI received information in the course of its investigation.

After exhausting his administrative appeals, Landano initiated this proceeding in the district court requesting that the court order the FBI to produce the entire contents of the requested files. The FBI submitted an affidavit of FBI Special Agent Regina Superneau detailing its reasons for withholding information under Exemptions 7(C) and 7(D), as well as under other exemptions not at issue here. The court granted summary judgment to Landano and ordered the FBI to release essentially all of the withheld material other than information that would disclose the identity of, or communications from, informants or undercover agents.

## II.

The FOIA, which is a part of the Administrative Procedure Act, requires that any federal agency promptly make available any records requested of it by any person so long as the request "reasonably describes such records." 5 U.S.C. § 552(a)(3). If an agency improperly withholds such documents, a federal district court may order production. Congress has exempted nine important categories of information from this blanket requirement, however. In this case, we are concerned with Exemption 7(C) and Exemption 7(D).

### A. *Exemption 7(C).*

We first consider Exemption 7(C). Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). If the agency invokes Exemption 7(C), it has the burden "to sustain its action." *Id.* § 552(a)(4)(B).

An agency's invocation of Exemption 7(C) requires us to identify the privacy interests that would be affected by release of the requested information as well as the public interests that would be served by disclosure. After identifying the compet-

ing interests we are then called upon to balance those interests to determine if disclosure is appropriate, i.e., whether disclosure "could reasonably be expected to constitute an *unwarranted* invasion of personal privacy." § 552(b)(7)(C) (emphasis supplied). *See United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989).

Landano does not dispute the right of the FBI to withhold the names of FBI undercover agents or FBI informants. We are concerned here with: (1) the names of other FBI employees that appear in the requested documents; (2) the names of the persons interviewed during the investigation; (3) the names of third parties mentioned by those interviewed; and (4) the identities of state and local law enforcement personnel who participated in the investigation. Thus, our Exemption 7(C) analysis is concerned solely with the failure to disclose the identity of individuals who were involved in the investigation or in the events with which the investigation was concerned.

### 1. *Privacy Interests*

■ The district court held that the FBI had not made an adequate showing that disclosure of the information withheld under Exemption 7(C) would implicate anyone's privacy interest. In its words, the "defendant offers nothing to convince the court that the dangers involved in releasing such information exist in this particular case, particularly in view of the approximately 14 years which have elapsed since the underlying investigation." *Landano v. United States Dep't of Justice*, 751 F.Supp. 502, 508 (D.N.J.1990). We do not agree.

Numerous courts of appeals have recognized that individuals involved in a criminal investigation—including suspects, witnesses, interviewees, and investigators—possess privacy interests, cognizable under Exemption 7(C), in not having their names revealed in connection with disclosure of the fact and subject matter of the investigation. *See, e.g., Safecard Services, Inc. v.*

*SEC*, 926 F.2d 1197, 1205 (D.C.Cir.1991) ("suspects, witnesses and investigators" have privacy interests implicated by release of their names in connection with a criminal investigation); *KTVY–TV v. United States*, 919 F.2d 1465, 1469 (10th Cir.1990) (witnesses and persons named by them have privacy interests). Suspects of the investigation have the most obvious privacy interest in not having their identities so revealed. *Baez v. United States Dep't of Justice*, 647 F.2d 1328, 1338 (D.C.Cir.1980). However, disclosure of the names of interviewees and witnesses may result in embarrassment and harassment to them as well. Criminal investigations turn up a myriad of details about the personal lives of witnesses and interviewees and for some, disclosure of the fact of cooperation with the investigation may itself result in reprisals or strained personal relationships. Moreover, as this case demonstrates, many people may have reason to seek out and question those who have supplied information in the course of a criminal investigation. *See, e.g., Halloran v. Veterans Admin.*, 874 F.2d 315, 321 (5th Cir.1989), ("many of the nonsuspects who are identified or referred to in the transcripts have discernible privacy interests in not having their thoughts, comments, and views regarding their work, their job performance, and their co-workers, clients, and friends released to the public. Moreover, merely being associated with a criminal investigation may lead to further embarrassment and difficulties."); *Cleary v. FBI*, 811 F.2d 421, 424 (8th Cir.1987) (recognizing privacy interests in avoiding "unnecessary questioning concerning the investigation [and] subpoenas issued by private litigants in civil suits incidentally related to the investigation," although conceding that these privacy interests may be overborne by greater public interests).

Moreover, this court has held that even the law enforcement personnel involved in a criminal investigation have a privacy interest, cognizable under Exemption 7(C), in not having their identities disclosed. In *Patterson by Patterson v. FBI*, 893 F.2d 595, 601 (3d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990),

we concluded that the FBI acted properly in withholding under Exemption 7(C) the names of the FBI personnel who had conducted an investigation because investigators have a privacy interest in not being identified with particular investigations and because in the context of that case "only a negligible benefit would inure to the public by releasing" the names of the law enforcement personnel involved. Other courts of appeals have recognized the same privacy interest. *See, e.g., Ingle v. United States Dep't of Justice,* 698 F.2d 259, 269 (6th Cir.1983) ("It is, of course, well established that FBI agents themselves have the right to be protected against public disclosure of their participation in law enforcement investigations pursuant to exemption (b)(7)(C)."); *Nix v. United States,* 572 F.2d 998, 1006 (4th Cir.1978) ("One who serves his state or nation as a career public servant is not thereby stripped of every vestige of personal privacy, even with respect to the discharge of his official duties. Public identification of any of these individuals could conceivably subject them to harassment and annoyance in the conduct of their official duties and in their private lives.").

Our decision in *Lame v. United States Department of Justice,* 654 F.2d 917 (3d Cir.1981) is not at odds with these authorities. There, we stated that there is no *per se* rule that "the mere connection of an individual with a criminal investigation constitutes an *unwarranted* invasion of his privacy." *Id.* at 923 n. 6 (emphasis added). We read this observation not to imply that such a person has no privacy interest in such a case, but rather that such a privacy interest does not always trump the public interest in disclosure. The inclusion in this observation of the word "unwarranted," which is the textual basis for the balancing of private and public interests under Ex-

emption 7(C), supports this reading of *Lame.*

While the privacy interests of those involved in a criminal investigation may become diluted by the passage of time, several courts have recognized that the potential for embarrassment and harassment may endure for many years. *E.g., Keys v. United States Dep't of Justice,* 830 F.2d 337, 348 (D.C.Cir.1987) (The passage of forty years "does not so dilute the privacy interest as to tip the balance the other way."); *Diamond v. FBI,* 707 F.2d 75, 77 (2d Cir.1983) ("For persons who were subjects of an FBI investigation or who cooperated with the agency [during the McCarthy era] the potential for embarrassment, harassment, or other repercussions remains acute"), *cert. denied,* 465 U.S. 1004, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984).[1] Since interest in the Snow homicide has not been extinguished by time, it seems apparent to us that some potential for embarrassment and harassment remains. Indeed, Landano candidly acknowledges that he wants the names disclosed so that he may track down and question the participants in the Snow investigation. While his desire to do so is understandable and while their interest in not having the matter resurrected in their lives is not necessarily entitled to prevail, Landano's intentions do bear witness to the fact that privacy interests remain despite the passage of years.

We hold in accord with *Patterson* that individuals who are associated with a criminal investigation have a privacy interest under Exemption 7(C) of the FOIA such that the government may be justified in refusing to disclose their names. While that interest may be stronger for some categories of these persons than for others, we need not resolve that question until we are forced to balance the privacy interests

---

**1.** An example of the longevity of individual privacy interests in government files has made its way into recent newspapers. With the unification of East and West Germany came the problem of dealing with the 6 million dossiers that the East German Secret Police had compiled on individuals within the country. The government of the unified Germany has chosen to release a person's file if that individual requests it. As a result, dissidents and other citizens now

have access to the names of informers who passed information to the government. In one instance, an East German opposition leader who is now a member of the new parliament discovered that her husband had been passing information to the government for many years. *See Germans Rush to See Big Brother's Files,* Chi. Trib., Jan. 3, 1992, at 4; John Tagliabue, *Files of East German Secret Police Are Opened but Few Seek Access,* N.Y. Times, Jan. 3, 1992, at A2.

that would be affected by disclosure against the public interest in disclosure.

## 2. *Public Interest*

■ We turn now to the asserted public interest in disclosure of these names. The district court concluded that Landano's "right to information that establishes his innocence and the public's interest in assuring that the innocent are not wrongfully convicted and confined furthers the policy concerns which engendered the statute." 751 F.Supp. at 503. The district court cited *Ferri v. Bell*, 645 F.2d 1213 (3d Cir.1981) in support of this conclusion. There, a *federal* defendant requested material from the FBI files in order to show that *federal* prosecutors violated the *Brady* rule. We held that disclosure of such material would advance an "indirect public purpose." *Id.* at 1218. However, recognizing a public interest under the FOIA in uncovering federal violations of the *Brady* rule does not require that we recognize an identical public interest in uncovering state violations of *Brady*.

Two recent decisions of the Supreme Court guide us in identifying the relevant public interests to be weighed against the privacy interest we have just discussed: *Reporters Committee* and *United States Department of State v. Ray*, — U.S. —, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991). When the Supreme Court in *Reporters Committee* addressed the relevant public interest involved in withholding of an FBI rap sheet on a private individual, it first repeated statements from its earlier decisions that neither the "purposes for which the request is made" nor the "identity of the requester" can determine whether the public has an interest in disclosure. *Reporters Comm.*, 489 U.S. at 771, 109 S.Ct. at 1480. Thus, the question of public interest must turn on "the nature of the requested document and its relationship to the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny,'" *id.* at 772, 109 S.Ct. at 1481 (quoting *Department of Air Force v. Rose*, 425 U.S. 352, 372, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976)), that is, to let the citizenry "know what their government is up to." *Id.* 489 U.S. at 773, 109 S.Ct. at 1481. Accordingly, "[o]fficial information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose. That purpose, however, is not fostered by disclosure of information about private citizens that is accumulated in various government files but that reveals little or nothing about an agency's own conduct." *Id.*

To illustrate these principles, the Court referenced its previous decision in *Department of Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). There, the requester had asked for disciplinary hearing summaries maintained in the Air Force Academy's files. The summaries were provided but were redacted to protect the identities of participants in the disciplinary proceedings. The Court in *Reporters Committee* noted that the summaries in *Rose* "obviously contained information that would explain how the disciplinary procedures actually functioned and therefore were an appropriate subject of a FOIA request." *Reporters Comm.*, 489 U.S. at 773, 109 S.Ct. at 1482. However, the Court stated that the *names* of particular cadets were "irrelevant to the inquiry into the way the Air Force Academy administered its Honor Code," *id.*, and had properly been withheld.

In *Reporters Committee*, the requester insisted that the public interest would be served by disclosure of the rap sheet because the individual whose criminal record was requested had allegedly had dealings with a corrupt Congressman and was an officer of a corporation with defense contracts. Noting that the rap sheet "would tell us nothing directly about the character of the *Congressman's* behavior" or "about the conduct of the *Department of Defense* (DOD) in awarding ... contracts," the Court held that the alleged public interest in the release of the rap sheet was "not the type of interest protected by the FOIA." *Id.* at 774–75, 109 S.Ct. at 1482–83 (emphasis in original).

In *Ray*, the plaintiffs were undocumented aliens from Haiti who were seeking political asylum in the United States. They sought to prove that, as Haitians who immigrated illegally, they had a well-founded fear of persecution if they return to

their homeland. The government asserted in response that any such fear was unfounded. To support this assertion, the government relied in part on interviews conducted as a part of a State Department investigation designed to ascertain whether the Haitian government was living up to a commitment that indicted Haitians would not be subject to prosecution for illegal departure. An FOIA demand for all documents reflecting the interviews was honored by the State Department but the names of the interviewees and other identifying information were redacted. In *Ray*, the redacted information was withheld under Exemption 6,[2] but the case is nevertheless important for present purposes. The Supreme Court noted the similarity of the language in Exemption 6 and Exemption 7(C) and, indeed, pointed out that the government's burden is heavier under the former than the latter. Under Exemption 6, the government must show a "clearly unwarranted invasion of personal privacy" while under Exemption 7(C), only an "unwarranted invasion of personal privacy" must be shown.

After concluding that the refugees interviewed after their return to Haiti had a privacy interest in avoiding the disclosure of their names, the Court held that there was no relevant public interest in the disclosure of their identities:

> [T]he Court of Appeals properly recognized that the public interest in knowing whether the State Department has adequately monitored Haiti's compliance with its promise not to prosecute returnees is cognizable under FOIA. We are persuaded, however, that this public interest has been adequately served by disclosure of the redacted interview summaries and that disclosure of the unredacted documents would therefore constitute a clearly unwarranted invasion of the interviewees' privacy.

> The unredacted portions of the documents that have already been released to respondents inform the reader about the State Department's performance of its duty to monitor Haitian compliance with the promise not to prosecute the returnees. The documents reveal how many returnees were interviewed, when the interviews took place, the contents of individual interviews, and details about the status of the interviewees. The addition of the redacted identifying information would not shed any additional light on the Government's conduct of its obligation.

*Ray*, 112 S.Ct. at 549.

The Court in *Ray* acknowledged that the plaintiffs might be able to use the names to obtain from the interviewees information not contained in the State Department files that would be of help in their immigration proceedings. The Court declined the invitation of the government to adopt a *per se* rule that such "derivative use" of government information, i.e., the use of government information to discover helpful information not in the government's possession, could not serve a public interest protected by the FOIA. The Court held, however, that in the absence of reason to believe that the derivative use would produce information impugning the record impression of how the agency is performing its responsibilities, there was no relevant public interest to balance against competing privacy interests.

> The Government argues that such "derivative use" of requested documents is entirely beyond the purpose of the statute and that we should adopt a categorical rule entirely excluding the interest in such use from the process of balancing the public interest in disclosure against the interest in privacy. There is no need to adopt such a rigid rule to decide this case, however, because there is nothing in the record to suggest that a second series of interviews with the already-interviewed returnees would produce any relevant information that is not set forth in the documents that have already been produced. Mere speculation about hypothetical public benefits cannot outweigh a demonstrably significant invasion of privacy. Accordingly, we need not ad-

---

2. Exemption 6 provides that the FOIA disclosure requirements do not apply to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

dress the question whether a "derivative use" theory would ever justify release of information about private individuals.

We are also unmoved by respondents' asserted interest in ascertaining the veracity of the interview reports. There is not a scintilla of evidence, either in the documents themselves or elsewhere in the record, that tends to impugn the integrity of the reports. We generally accord government records and official conduct a presumption of legitimacy. If a totally unsupported suggestion that the interest in finding out whether government agents have been telling the truth justified disclosure of private materials, government agencies would have no defense against requests for production of private information.

*Id.* 112 S.Ct. at 549–50.

Before the Supreme Court's decision in *Ray,* the Court of Appeals for the Fifth Circuit applied the teachings of *Reporters Committee* to a case presenting facts similar to those involved here. *Burge v. Eastburn,* 934 F.2d 577 (5th Cir.1991). In *Burge,* a state inmate sought FBI records containing the pretrial statements of persons who had testified at his murder trial. The inmate argued that there was a public interest in ensuring that he had received a fair and impartial adjudication of guilt or innocence at trial. The court recognized that there is, of course, a public interest in fair trials and perhaps in the contents of alleged statements to the FBI. However, the court, relying on *Reporters Committee,* rejected the contention that this was a public interest cognizable under the FOIA: "As in *Reporters Committee,* the requester in this case 'does not intend to discover anything about the conduct of the agency that has possession of the requested records.'" *Id.* at 580 (quoting *Reporters Comm.,* 489 U.S. at 773, 109 S.Ct. at 1481).

■ The rationale of the district court in the current dispute for its finding of a relevant public interest is inconsistent with the teachings of *Reporters Committee, Ray,* and *Burge.* There is undoubtedly a public interest in seeing that the guilty are convicted and that the innocent are not. However, whether that particular public interest is recognized by the FOIA is a separate question. Only when the information requested reflects directly upon the way that the agency conducts business has the requester placed something on the public interest side of the balancing equation. Because the information requested by Landano would shed no light on the way that the FBI fulfills its responsibilities, it "falls outside the ambit of the public interest that the FOIA was enacted to serve." *Reporters Comm.,* 489 U.S. at 775, 109 S.Ct. at 1482.

Perhaps in recognition of the conflict between the district court's reasoning and that of these other decisions, Landano advances the additional argument that disclosure of the identities of those involved in the investigation would serve the public interest, as well as his own, because it may help him to show that information exculpatory to him and inculpatory to Forni was withheld from the defense. The public, he suggests, clearly has an interest in whether its law enforcement officers are engaging in this kind of misconduct.

■ Landano here paints with too broad a brush. Landano was convicted of murder in a state court. No federal prosecution ever took place in this case. Accordingly, any *Brady*-type wrongdoing must necessarily have involved the state prosecutors, not the FBI or federal prosecutors. To the contrary, the district court expressly found that there was no reason to believe there was any FBI wrongdoing involved in this case. Accordingly, we conclude that just as there is no FOIA-recognized public interest in discovering evidence in federal government files of a private party's violation of the law, *see Reporters Comm.,* 489 U.S. at 774, 109 S.Ct. at 1482, there is no FOIA-recognized public interest in discovering wrongdoing by a *state* agency.

### 3. *Balancing Private and Public Interests*

■ Because we have concluded that there is no public interest in the disclosure of the names here and that the individuals involved have at least some privacy interest in not having their names disclosed in con-

nection with a criminal investigation, we conclude that the public interest asserted by Landano does not outweigh the privacy interests of others and, accordingly, that disclosure of the names could reasonably be expected to constitute an unwarranted invasion of personal privacy.

We find this case virtually on all fours with *Ray*. Like the Haitians in *Ray*, Landano seeks the withheld names for understandable reasons but for reasons that are extraneous to the purpose of the FOIA. Here as there, there is information in the file that could be used for the relevant purpose of evaluating the performance of the federal agency involved but that information has been disclosed and there is no reason to believe that the additional disclosure of the names would materially enhance anyone's ability to perform that evaluation. Finally, here as there, while the names would permit the requester to investigate "behind the government files" and gather non-government held information that might conceivably reflect adversely on the performance of the federal agency, there is nothing in the record suggesting misconduct on the part of that agency. For the reasons given in *Ray*, we conclude that the FBI's reliance on Exemption 7(C) is justified.

Because the district court did not apply the correct legal standard in granting summary judgment under Exemption 7(C), we will reverse that portion of the judgment ordering production of materials withheld in reliance on Exemption 7(C).

### B. *Exemption 7(D)*

Exemption 7(D) exempts from the FOIA's disclosure requirements:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution furnished on a confidential basis, ... and, in the case of a record or information compiled by criminal law enforcement authority in the course of a crimi-

nal investigation ..., information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D). Here again, the "burden is on the agency to sustain its action under this Exemption." 5 U.S.C. § 552(a)(4)(B).

When a source that has supplied information in the course of a criminal investigation is "confidential," the agency may withhold not only the source's identity but also any information obtained from that source. Thus, unlike the materials withheld under Exemption 7(C), more is at stake here than just the identity of the FBI's sources of information; information provided by allegedly confidential sources may be withheld as well. Moreover, Exemption 7(D), unlike Exemption 7(C), does not require or allow any weighing of interests or any consideration of the contents of the information. If information was provided by a confidential source, the courts may not order disclosure of that information no matter how strong the public interest in disclosure. This reflects the fact that the purpose of Exemption 7(D) is to protect the ability of law enforcement agencies to obtain the cooperation of persons with relevant information. It is not, like Exemption 7(C), designed to protect against unwarranted invasions of privacy.

The FBI's affidavit in this case identifies the specific pages withheld and the redacted portions of specific pages produced and asserts that the information there set forth was compiled for law enforcement purposes and, if produced, could reasonably be expected to disclose the identity of a confidential source or information furnished by such a source. It goes on to make the following representations with respect to the experience of the FBI in conducting interviews during a criminal investigation:

> During the course of most investigations, many individuals who are not established sources of the FBI, are interviewed under circumstances in which confidentiality is created. These individuals furnish information with either an expressed or implied understanding that their cooperation will not be needlessly divulged outside the FBI. Release of the identities of these confidential sources or the informa-

tion they provided could subject these sources to negative public attention, and could inhibit future cooperation from these individuals or other individuals in possession of information of value to the FBI.

\* \* \* \* \* \*

When Agents of the FBI conduct interviews, the FBI is seeking the assistance of the interviewee either to obtain facts that will result in the prosecution of the subject(s) of an investigation or to solicit the cooperation and assistance of the interviewee in a matter which may impact on the national security of the United States. In both cases, the FBI is asking individuals to become involved in situations in which others may lose substantial liberty or property interests; thus, the interviewee is placed in a position that could subject him or her to acts of reprisal, harassment, litigation, or an unnecessary amount of public attention. Individuals providing information to Federal agencies in furtherance of a law enforcement activity must be free to do so without fear of possible reprisal should their identities or their information be disclosed to persons in whom they have not confided. This is not to say that any such reprisal is threatened or even likely in this case, but a general public policy requires that individuals must be free to furnish investigative information to the Government with complete candor and without the understandable tendency to hedge or withhold information out of fear that their names or information furnished will later be made public. Persons providing information, including witnesses to a crime who may expect to be called upon at a later time to testify in public at a judicial proceeding, should be secure in the knowledge that, absent the necessity of such public testimony with its attendant judicial restraints and protections, their assistance and their identities will be held in confidence. The fear of such exposure all too often inhibits the cooperation of otherwise conscientious citizens. These considerations have been met by the traditional willingness and ability of the FBI to assure persons interviewed that their identities would be protected.

App. at 175–76, 180–81.

The FBI's affidavit provides no other details with respect to the circumstances of any particular interview or source. Further, it provides no reference to the character of the information withheld or the nature of the investigation, although there is apparently no dispute that the investigation involved was that of the Snow homicide and the parties agree on the general background from which this case arises.

The district court held that the FBI's affidavit was insufficient, as a matter of law, to satisfy the FBI's burden of establishing that the information came from a "confidential source." [3] In challenging this conclusion, the FBI first refers us to legislative history indicating that a "confidential source" includes not only a person who has received an express assurance of confidentiality, but also a person who has provided information "in circumstances from which such an assurance can reasonably be inferred." The FBI then asserts that an affidavit like the one it has here filed will permit, and ordinarily should occasion, an inference that the information came from a confidential source. It cites cases from no less than six courts of appeals for the proposition that "promises of confidentiality are inherently implicit in FBI interviews conducted pursuant to a criminal investigation." *See Dow Jones & Co. v. United States Dep't of Justice,* 917 F.2d 571, 576 (D.C.Cir.1990); *Schmerler v. FBI,* 900 F.2d 333, 337 (D.C.Cir.1990); *Keys v. United States Dep't of Justice,* 830 F.2d 337, 345 (D.C.Cir.1987); *Donovan v. FBI,* 806 F.2d 55, 61 (2d Cir.1986); *Diamond v. FBI,* 707 F.2d 75, 78 (2d Cir.1983), *cert. denied,* 465 U.S. 1004, 104 S.Ct. 995, 79 L.Ed.2d 228

---

**3.** The district court stated, *inter alia,* that the FBI had failed to provide "case specific reasons for non-disclosure" and that such reasons were required as a matter of law to sustain its burden. Because the FBI did represent that the specific information in the files here at issue was received in FBI interviews and thus came within the scope of Exemption 7(D), we take this to mean the district court believed some information concerning the circumstances of such interviews or sources was required.

(1984); *Pope v. United States,* 599 F.2d 1383, 1386–87 (5th Cir.1979); *Ingle v. United States Dep't of Justice,* 698 F.2d 259, 269 (6th Cir.1983); *Brant Constr. Co. v. United States Envtl. Protection Agency,* 778 F.2d 1258, 1263 (7th Cir.1985); *Miller v. Bell,* 661 F.2d 623, 627 (7th Cir.1981), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 484 (1982); *KTVY–TV v. United States,* 919 F.2d 1465, 1470–71 (10th Cir.1990); *Johnson v. United States Dep't of Justice,* 739 F.2d 1514, 1517–18 (10th Cir.1984). The district court's holding and this response of the FBI pose the issue for decision under Exemption 7(D).

We turn initially to the statutory language and legislative history. The legislative history indicates that the term "confidential source" includes more than undercover informers and undercover agents. The Conference Committee opted for the term "confidential source" over the term "informer" that was contained in the Senate version of the bill. This change was designed to make clear that a confidential source includes not only a paid informer but also a "citizen volunteer" who has "provided information under an express assurance of confidentiality *or* in circumstances from which such an assurance could reasonably be inferred." S.Rep. No. 1200, 93rd Cong., 2d Sess. 13, *reprinted in* 1974 U.S.Code Cong. & Ad.News 6267, 6291 (emphasis added). There is no direct evidence in the legislative history, however, as to whether Congress intended that every person interviewed pursuant to a criminal investigation was to be considered—at least in the absence of contrary evidence— a "confidential source."

The 1986 amendments to FOIA were adopted with almost no legislative background. Until 1986, Exemption 7(D) covered the production of records that "would disclose" the identity of a confidential source or information provided by a confidential source. The 1986 amendments changed the language so that the Exemption now covers the production of records or information that "could reasonably be expected to disclose" the identity of a confidential source or information provided by a confidential source. This change was intended to lighten the agency's burden in invoking Exemption 7, *Reporters Committee,* 489 U.S. at 756 n. 9, 109 S.Ct. at 1473 n. 9, and was consistent with a categorical approach at least with respect to Exemption 7(C) cases. *Id.* at 777–78 n. 22, 109 S.Ct. at 1484 n. 22. However, the amendments did not define "confidential source" with any greater precision than had been done earlier.

At times, the FBI characterizes its position as a contention that a presumption of an assurance of confidentiality arises as a matter of law whenever information is shown to come from an FBI interview in the course of a criminal investigation. Understandably, Landano responds that such a presumption is at odds with Congress's determination in the FOIA that the burden of establishing entitlement to an exemption rests upon the government. We believe this characterization of the FBI's position misstates the issue before us.

In the legislative history, Congress has supplied a definition of a confidential source. Included within that definition are persons who, while not the beneficiaries of an express assurance of confidentiality, nevertheless spoke under circumstances in which such an assurance can reasonably be inferred. If a government agency files an affidavit reciting all of the surrounding circumstances of a particular interview and the district court believes a reasonable interviewee would feel so assured under such circumstances, a conclusion that the interviewee was a confidential source is clearly warranted. The issue presented by the district court's decision in this case is how much less than such a showing will, in the absence of contrary evidence, permit such a conclusion. In other words, what is the "minimum evidentiary showing" that will permit an inference that the interviewee probably had a reasonable expectation of confidentiality? We thus view the issue as one of what constitutes a *prima facie* case of "confidential source." If the "minimum evidentiary showing" is enough to permit a rational inference that the person involved more likely than not falls within Congress's definition of "confidential source," the agency cannot be said to have gotten un-

fair assistance, in the form of a legal presumption, in meeting its statutory burden.

In determining how much is enough, it is helpful to first determine what Congress had in mind when it referred to an "assurance of confidentiality." We believe it clearly could not have been thinking of an assurance that the information supplied would not be disclosed beyond the FBI. Because an absolute assurance against use would be inconsistent with the government's obligations under *Brady* and the Federal Rules of Criminal Procedure and would, in any event, render the information virtually worthless to the FBI, such assurances must be exceedingly rare, if indeed they exist at all. We are therefore confident that Congress had a less sweeping assurance in mind. Rather, it seems far more likely that Congress had in mind an assurance that the FBI would not directly or indirectly disclose the cooperation of the interviewee with the investigation unless such a disclosure is determined by the FBI to be important to the success of its law enforcement objective.

The issue for decision is thus whether the fact that the source supplied information to the FBI in the course of a criminal investigation is alone sufficient to support an inference that the source probably had a reasonable expectation that no unnecessary disclosure of his or her cooperation would occur. This, we believe, is a close question.[4] After all, the FBI is generally known to involve itself only in significant criminal matters and this means that in any FBI investigation, there are likely to be persons who have motives for resenting those who cooperate with it.[5] On the other hand, we acknowledge that there are undoubtedly many routine FBI interviews in the course of criminal investigations that are unlikely to give rise to similar apprehensions on the part of the interviewee. In light of the disparate nature of FBI interviews, a record like the one before us arguably permits nothing more than speculation as to whether a particular interview was conducted on a confidential basis.

Our panel need not resolve this difficult issue here, however, because we do not write on a clean slate. In *Lame v. United States Department of Justice*, 654 F.2d 917, 929 (3d Cir.1981) (*"Lame I"*), we were confronted with a situation virtually identical to that now before us. Because there have been no intervening teachings of the Supreme Court that require our departure from that precedent, our disposition of this case must be the same as the one there reached. Internal Operating Procedure 9.1.

In *Lame*, the requester sought FBI 302 forms for named individuals whose identities he had discovered from public records of a much publicized federal prosecution of two members of the Pennsylvania legislature. A 302 form is used by the FBI to record the substance of an interview with a potential witness. The FBI refused even to confirm or deny the existence of the designated 302s because confirmation without more would disclose that the named individuals had cooperated with the FBI. The FBI first filed an affidavit by a special agent who "asserted that individuals who

4. If one were to answer this question in the affirmative, one might still insist on a more specific record than we have before us in this case. That record, for example, does not affirmatively reflect that the interviewees knew their interviewer was an FBI agent and knew the purpose for which the information was sought. While we can appreciate that insurmountable recordkeeping problems might be created by a requirement that the overall circumstances of each interview be included in the FBI affidavit, it is not apparent to us why some representation could not be made on this score based on the agents' notes or consistent FBI practice.

5. Moreover, while the FBI has made a deliberate decision in this case to rely solely on the fact that the withheld information is the product of

FBI interviews, the issue becomes even closer when one adds to the equation other background facts which do not concern what went on at the time of a particular interview. We know, for example, that the criminal investigation involved in this instance was one concerning the shooting of a policeman and that the crime and investigation received a great deal of publicity, including media reports that a motorcycle gang was suspected of having been involved. In this context, one might more readily infer that the source would not have gotten involved absent an assurance that his cooperation would not be indiscriminately disclosed. As we shall see, this background information does not distinguish our case from the *Lame* case where well-known and powerful people were the subjects of the investigation.

furnish information to the FBI do so with the understanding that the information given by them and their relationship with the agency will be held in the strictest confidence." *Id.* at 925. The FBI later submitted an *in camera* affidavit and representative 302s, asserting, *inter alia,* that in order to obtain the interviews "assurance, either express or implied, had been given to the interviewees that there would be no indiscriminate release to the public of their identities." *Id.* at 920.

This court agreed with the FBI that it was justified in resorting to an *in camera* affidavit and indicated that there would be no problem with the FBI's position if its *in camera* affidavit had been sufficiently detailed. We concluded, however, that the *in camera* affidavit was insufficient for purposes of Exemption 7(D):

> Whether there is an expressed or an implied assurance of confidentiality is a question of fact to be determined in regard to each source.
>
> \* \* \* \* \* \*
>
> [T]he Section 7(D) confidential source exemption requires that an assurance of confidentiality be found for each source. Thus, the district court, in order to find that such assurances, express or implied, were given, had to have been furnished with detailed explanations relating to each alleged confidential source.

*Id.* at 923, 928.

 In *Lame,* we reached our conclusion regarding Exemption 7(D) reluctantly, voicing our dual concerns that our holding (1) would unduly tax limited FBI resources and (2) might discourage future cooperation with the FBI. We concluded, however, that it was for Congress, rather than this court, to "attempt to accommodate the[se] concerns." *Id.* at 929.

For reasons that we have heretofore explained, we find no necessary inconsistency between *Lame's* insistence that the existence of an implied assurance of confidentiality is a question of fact to be determined for each source and the results reached by the numerous courts of appeals that have inferred an assurance of confidentiality from the fact that information was obtained in an FBI interview during a criminal investigation. Nevertheless, we

believe *Lame,* fairly read, contemplates a showing by the government of the particular circumstances of an interview or source. Clearly the record before us is indistinguishable from the record before the court in *Lame,* and the *Lame* court held the record before it to be insufficient to support a finding of confidentiality. Accordingly, we conclude that *Lame* requires this panel to affirm the judgment of the district court with respect to Exemption 7(D).

The FBI argues that given *Reporters Committee,* we are no longer bound by *Lame.* First, it contends that the Supreme Court found that the 1986 FOIA amendment reflects a general congressional desire to ease the government's burden under Exemption 7. Second, the FBI maintains that the Supreme Court intended the categorization process it adopted for Exemption 7(C) cases to be utilized in the context of other exemptions. While there is language in *Reporters Committee* that may be a harbinger of a general easing of the government's FOIA burden, there is nothing of sufficiently direct import for Exemption 7(D) jurisprudence to warrant this panel's ignoring the holding of the panel in *Lame.*

Before the 1986 amendment, Exemption 7(D) provided that an agency could withhold information compiled for law enforcement purposes if production "would disclose the identity of a confidential source." The amendment substituted the phrase "could reasonably be expected to" for the word "would." This change speaks to the degree of risk of confidential source disclosure Congress was willing to accept. It says nothing about what Congress means by "confidential source."

The Supreme Court's approval of a categorical approach to an Exemption 7(C) case similarly tells us nothing new about the meaning of "confidential source" under Exemption 7(D). Prior to *Reporters Committee,* the understanding had been that the weighing of privacy interests and public interest required by Exemption 7(C) was to be done on a case-by-case basis. In that case, the Supreme Court indicated that

where it could be said of a category of documents, as of FBI rap sheets, that "the balance characteristically tips in one direction," case-by-case balancing is not required and documents within that category may be declared exempt. *Reporters Comm.*, 489 U.S. at 776, 109 S.Ct. at 1483. While the Court's opinion suggests that a similar categorical approach may appropriately be substituted for "case by case balancing" under exemptions other than 7(C), determining what constitutes a "confidential source" and what constitutes a *prima facie* showing of a "confidential source" does not involve "case by case balancing."

Finally, the FBI argues that we should sustain its position because it tendered its entire files to the district court for *in camera* inspection. We decline to hold that the government can sustain its burden in this manner. While it is clearly appropriate for an agency to so tender its files, it cannot through such a tactic require the court to do its homework for it. In *Lame v. United States Department of Justice*, 767 F.2d 66 (3rd Cir.1985) *Lame II*, the government's position was sustained because it submitted not only the 302 forms for *in camera* inspection but also an *in camera* affidavit providing the court with the details found wanting in *Lame I*.[6]

### III.

In the ten years since this court decided *Lame I*, six other courts of appeals have reached decisions that are in tension, if not in direct conflict, with the view we there took of what constitutes a *prima facie* showing under Exemption 7(D). Nevertheless, we find this case indistinguishable from *Lame I*, and as a panel, are not at liberty to depart from prior circuit precedent. Accordingly, we will affirm that portion of the district court's judgment which directs production of material withheld solely on the basis of Exemption 7(D). We will reverse that portion of the judgment, however, to the extent it orders production of material withheld in reliance on Exemption 7(C). On remand, the district court

---

**6.** The FBI urges that if we find *Lame I* to be controlling, we nevertheless hold that the district court erred in not giving the FBI a further opportunity to file *in camera* affidavits in an attempt to justify its position. Particularly in

---

will enter a new judgment implementing the decisions we have here reached.

### SUR PETITION FOR REHEARING

April 14, 1992.

Before SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, NYGAARD, ROTH, and ALDISERT, Circuit Judges.

The petition for rehearing filed by appellants in the above-entitled case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for panel rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.

Judges BECKER, STAPLETON, MANSMANN, GREENBERG, and HUTCHINSON would have granted rehearing.

---

light of the instruction provided by the opinion in *Lame I* and *II*, we cannot say the district court abused its discretion in ordering production without giving the FBI yet another chance.