947 A.2d 570

**Catherine L. REITER, et al.**

v.

**ACANDS, INC., et al.**

**No. 670 Sept.Term, 2006.**

Court of Special Appeals of Maryland.

May 6, 2008.

Michael T. Edmonds (Timothy J. Hogan, Steven M. Lubar, Law Offices of Peter T. Nicholl, on the brief), Baltimore, MD, for appellants.

Steven J. Parrott and Warren N. Weaver (Neil J. MacDonald, Helyna M. Haussler, Hartel, Kane, DeSantis, MacDonald & Howie, LLP, on the brief), Beltsville, MD; (James R. Benjamin, Jr., Whiteford, Taylor & Preston, on the brief), Baltimore, MD; (R. Thomas Radcliffe, Laura M. Higgs, DeHay & Elliston, LLP, on the brief), Baltimore, MD, for appellee.

Panel: SALMON and WOODWARD, JJ., and RAYMOND G. THIEME, Jr., J. (Retired, Specially Assigned).

RAYMOND G. THIEME, Jr., Judge (Retired, Specially Assigned).

Appellants, individually and as the Personal Representatives of three deceased former employees [1] of Bethlehem Steel

---

1. Appellants are: Charlotte J. Johnson, Personal Representative of the Estate of William H. Johnson; Catherine L. Reiter, Personal Represen-

Corporation's Sparrows Point, Maryland facility, appeal from a decision of the Circuit Court for Baltimore City granting summary judgment in favor of appellees Eaton Corporation, successor in interest to Cutler–Hammer, Inc. ("Cutler–Hammer"), Pneumo Abex LLC ("Abex"), and Square D Company ("Square D"). The complaints alleged that William H. Johnson, William A. Reiter, and Harold R. Williams suffered from lung cancer as a result of occupational exposure to appellee's asbestos-containing crane brakes.

Appellants present the following question for our review:

Did the trial court err in granting summary judgment and dismissing appellants' asbestos injury claims as a matter of law on the issue of substantial factor causation where appellants presented evidence that asbestos-containing crane brakes of the appellees were present throughout the areas where appellants worked and that appellants worked in the vicinity of those crane brakes when the crane brakes emitted asbestos-containing dust to which appellants were exposed[?]

For the reasons set forth below, we affirm the judgment of the circuit court.

## PROCEEDINGS BELOW

Multiple asbestos-related injury complaints were filed in the Circuit Court for Baltimore City against appellees in the instant case. The cases were consolidated into two groups for trial: *Edward A. Adams, Sr. et al. v. ACandS, Inc., et al.*, Consolidated No. 24X05000342, and *Donald Conyers, et al. v. ACandS, Inc., et al.*, Consolidated No. 24X05000346. The *Adams* Group included decedents William A. Reiter and Harold R. Williams, while the *Conyers* Group included decedent William H. Johnson.

On April 11, 2006, following two days of motions hearings, the circuit court granted summary judgment against appel-

tative of the Estate of William A. Reiter; and Arlene Williams, Personal Representative of the Estate of Harold R. Williams.

lants and in favor of appellees Abex, Cutler–Hammer, and Square D. In so doing, the court stated:

> The Court is mindful of the case law which has been adverted to by all parties concerned, in particular the *Balbos* case, and would note that in *Balbos,* the Court of Appeals adopted what is known as the frequency, regularity, and proximity test to determine the legal sufficiency of evidence of substantial factor causation in asbestos personal injury cases.
>
> And *Balbos* makes it clear that when the exposure of any given bystander, and in all instances, the plaintiffs in these cases are bystanders, whether the exposure of any given bystander to any particular supplier's product will be legally sufficient to permit a finding of substantial factor causation is fact specific to each case. . . .
>
> While each of the overhead cranes, without dispute, had multiple braking systems, these brakes were not located anywhere close to the average worker in these cavernous facilities; rather, the brakes were located dozens of feet off the ground and were in some instances five, maybe eight stories high in some locations.
>
> Taking into account the massive cavernous size of the facilities as well as the distance from laborers to the braking systems on the cranes, plaintiffs have . . . failed to show that workers were sufficiently proximate to or in the vicinity of the crane brakes to be considered in or very near the presence of asbestos-containing products and able to inhale fibers released from the products, as the Court of Appeals indicated in *Georgia–Pacific [v.] Pransky,* 369 Maryland 360[, 800 A.2d 722], 2002 case. . . .
>
> In other case law which I think is relevant to advert to at this point and which is relied upon heavily by each of the defendants with reference to the bystander cases before the Court, *Lohrmann* tells us that to support a reasonable inference of substantial factor causation from circumstantial evidence, and in large measure, these cases [are] circumstantial evidence cases, there must be evidence of exposure to a specific product on a regular basis over some extended

period of time in proximity to where the plaintiff actually worked.

To support a reasonable inference of substantial factor causation of a crane brake as to an asbestos-related disease, plaintiffs must do more than simply place themselves in the same massive facility in which overhead cranes were utilized and must do more than simply show that they or co-workers saw cranes being utilized overhead and that they helped to hook up or load—hook up loads onto cranes, they must demonstrate that they were proximate to or in the vicinity of a particular manufacturer's crane brakes at a time when such might have been expelling respirable fibers . . . .

Therefore, concluded as to those plaintiffs who did not work specifically on or adjacent to overhead crane brake systems or did not work regularly on the overhead cranes themselves failed to satisfy the proximity prong of the *Balbos* test as well as prescribed under the Maryland law.

Therefore, the claims of such plaintiffs, in viewing all the facts and inferences in a light most favorable to them, amount essentially to fiber drift claims.

Such plaintiffs have not submitted evidence, any evidence, no matter how attenuated or circumstantial, that would allow this Court to strain to permit their claims to survive the summary judgment.

With respect to the motions of summary judgment of the [ ] direct defendants here today are granted as to Plaintiffs . . . William A. Reiter, . . . Harold R. Williams, [and] William H. Johnson.

Additionally, even assuming arguendo that these plaintiffs could satisfy the proximity prong of *Balbos,* they still failed the separate frequency and regularity requirements of the *Balbos* test based upon what has been presented.

Further, even if they were able to satisfy the frequency, proximity and regularity requirements of *Balbos,* the claims still fail as to their arguments in this context as presented amount to really market share liability which is not recognized under Maryland law.

Appellants' Motions to Alter or Amend Judgment were denied on May 4, 2006, and appellants timely appealed to this Court. While all three appellees are parties to the appeal in the *Williams* case, only Square D is a party to the appeal in the *Reiter* case, and only Square D and Cutler–Hammer are parties to the appeal in the *Johnson* case.

## FACTS

### The Sparrows Point Facility

Bethlehem Steel's Sparrows Point facility is located in Baltimore, Maryland, and was once considered one of the largest steelmaking facilities in the world. In 1957, the facility covered more than 2,500 acres, or roughly four square miles, and employed over 25,000 people. Numerous mills and yards were located throughout the complex, including the scrap yard, the slab yard (which included the 40 inch mill, the 40 by 80 slab mill and the 45 by 90 slab mill), the 56 inch and 68 inch hot strip mills, the pipe mills, the 56 inch cold strip mills, the tin mill, the 54 inch mill, three rod and wire mills, the blooming mills, the 160 inch plate mill, the 60 inch plate mill, the blast furnace, four open hearths, the 56 inch sheet mill, the 66 inch sheet mill, and the coke ovens.

The dimensions of the tin mill are illustrative of the sheer size of the Sparrows Point facility. The tin mill alone was one and one-half miles long and one-half mile wide, covering an area of 480 acres or 20,908,800 square feet. The tin mill was, in turn, made up of several other mills, not all of which were in the same building. These mills included the 42 skin pass, 42 tandem mill, 56 tandem mill, 66 tandem mill, 56 hot mill, and 68 hot mill.

The Number 3 Rod and Wire mill was also at least three football fields in length, and the mills on the finishing side of the facility were said to be the size of small towns.

### Overhead Crane Braking Systems

Brakes on overhead cranes were necessary to brake the motors responsible for the motion of the crane. Each over-

head crane at the Sparrows Point facility had between 12 and 14 brakes. Each brake operated on a brake wheel that was attached to the motor shaft. During the operation of the brake, the brake pads or linings (the terms are used interchangeably) came into contact with the brake wheel and physically slowed the brake wheel down. The brake linings were attached to brake shoes, which were a part of the larger brake assembly. An actuator engaged and released the brake linings.

According to the deposition testimony of Edward Becker and Frank Mortis, both electricians, a puff of dust was created from the wear of the brake lining when the brakes grabbed hold of the brake wheel. According to Mr. Mortis, the dust would "just go in the atmosphere."

Mr. Becker testified that overhead crane brakes manufactured by a dozen different companies were used throughout the plant. The brake linings used on the different overhead crane brakes were not interchangeable; the type of lining used was determined by the manufacturer of the brake. Mr. Becker stated that other than a period of time in which there was experimentation with alternate sources of brake linings, Bethlehem Steel ordered replacement linings from the original manufacturer of the brake. Mr. Joseph Burlock, an electrical helper, also stated that he replaced worn brake linings with the same brand of lining as the brand of the brake shoe. Mr. Carroll Michalowski, who, as an expediter/material handler, ordered all the parts necessary for brake repairs, also testified that he bought all the replacement parts for the overhead crane brakes from the original equipment manufacturer. According to Mr. Michalowski, the brakes themselves would have a nameplate identifying the manufacturer of the brake. The brake linings could also be identified with a specific manufacturer because there were tags with part numbers in the packaging.

The process of replacing a worn brake lining was described by Mr. Becker. Some brake shoes came with the lining bolted to them and some brakes had linings that could be replaced

separately from the shoes. When replacing a lining separately from the brake shoe, it needed to be unbolted and pried out onto the brake wheel and then taken off. The replacement lining did not have to be cut or drilled to be put back in place. On the older cranes, where the brake linings were bolted to the shoes, the entire brake shoe had to be removed in order to change the lining.

William Banks, a crane millwright, testified that if everything lined up perfectly, the slide-in brake linings would take about five minutes to install. If they did not line up, it would take about an hour. If the wrong size lining was put on the shoe, they would take it back to the shop within the Sparrows Point facility and have it redone correctly rather than cut the brake liner down, because that took too long and was a waste of time. When non-slide-in shoes were used, if everything was lined up perfectly, installation would take 35 minutes to an hour.

Raymond Dembeck, a crane millwright, described the process of replacing an entire brake shoe. Brake shoes were replaced with shoes made by the same manufacturer as the motor. He stated that the asbestos linings on the replacement shoes were generally assembled in a "rough" fashion, so they had to be filed down to match up to a drum. The millwrights would also chamfer the ends of the pad to sweep debris off of the drum. Mr. Dembeck stated that the filing was done in a closed shop, about twelve feet by fourteen feet in size with an eight foot ceiling, and that the dust created would "float." Mr. Dembeck explained: "Probably our proximity to the thing that we were working on made [the dust] more noticeable to us than if we had been five feet away, no doubt, but it wasn't heavy enough to fall like an iron filing or something like that. It wasn't that kind of weight." He also stated: "In that area where we were, it would be a lot of dust, but not throughout the entire shop it wouldn't be. But where we were, yeah, it was a lot."

Frederick Faber, an electrician, also testified in his deposition that when the electricians changed a brake shoe, they

would test it and adjust it, and "the brake shoes would hit the wheel and dust would fly everywhere." He also stated that sliding a brake lining out of and back into the brake did not create dust.

### Abex

Abex provided the following information in its answers to appellant's interrogatories. During various periods from approximately 1927 to 1987, Abex manufactured and sold asbestos-containing automotive friction products, including brake linings and brake pads. The Abex automotive friction products that contained asbestos contained approximately 25 to 70 percent chrysotile, a type of asbestos that was resin bonded and encapsulated. Abex manufactured and sold its asbestos-containing automotive friction products under different trade names at different times.

According to the deposition testimony of Gerald Benzinger, a Westinghouse employee from 1954 to 1985, Westinghouse manufactured brakes for crane drive systems. Westinghouse would purchase the linings used in its brake assemblies from Abex. If Westinghouse supplied a brake lining as a replacement part, they would purchase it from Abex and resell it to the customer. Westinghouse recommended replacing the brake linings on its products with Abex Brake Block number 64. In fact, Abex lining number 64 would have to be used in order for Westinghouse to represent the torque ratings for its brake assemblies. Westinghouse did not put any of its own markings on the brake linings; replacement linings bought through the parts division at Westinghouse only had Abex markings on them. The Abex brake linings were dark gray, molded, and very smooth.

In its answers to appellant's interrogatories, Square D also stated that Abex manufactured and/or supplied brake lining materials to Square D for its use in manufacturing crane brake assemblies.

### Cutler–Hammer

Cutler–Hammer provided the following information in its answers to appellant's interrogatories. Cutler–Hammer man-

ufactured and sold certain products that contained asbestos components from approximately 1920 until approximately 1984. Cutler–Hammer brake lining components were sold beginning prior to 1956 and were phased out in the early 1980s. The material used for the brake linings is believed to have contained an unknown percentage of chrysotile asbestos. The friction surfaces that comprised brake linings were provided to Cutler–Hammer as fully formed materials. Known suppliers of friction surfaces included Johns–Manville, Raybestos–Manhattan and Asbestos Manufacturing Company. According to a 1981 Material Safety Data Sheet, Raybestos–Manhattan friction material contained 25–60 percent chrysotile asbestos.

### Square D

Square D provided the following information in its answers to appellant's interrogatories. From at least 1955 to approximately 2004, Square D manufactured and sold crane braking equipment. Prior to the mid–1980s, some of the braking equipment incorporated component parts that contained composite materials that may have contained some quantity of encapsulated asbestos. In general, asbestos-containing components could be found within the molded composite brake lining materials on certain braking equipment. The brake lining materials were manufactured and supplied to Square D by other companies, including Abex and Scan–Pac.

### William H. Johnson

Mr. William H. Johnson died of lung cancer on May 16, 2003. Only appellees Square D and Cutler–Hammer are implicated in Mr. Johnson's suit.

In his deposition, Walter John Sperl testified that he met Mr. Johnson in 1960, when they were both laborers in the slab yard. The slab yard had three open sides which were covered by a roof. Mr. Sperl testified that he and Mr. Johnson worked together in the slab yard on a regular basis from 1960 to 1972. When working with Mr. Johnson in the slab mill, Mr. Sperl worked all three shifts. Therefore, while Mr. Sperl's

and Mr. Johnson's shifts would not necessarily coincide, the two men were on a similar rotation. Mr. Sperl stated that there were six cranes in the slab yard which were located thirty feet or more in the air. He also stated that crane mechanics were in charge of changing out the brakes on those cranes and that he, while working underneath the cranes, did not pay any attention to what the mechanics were doing. Mr. Sperl did state, however, that he saw the crane mechanics using air hoses to blow dust off of the brakes. He also stated that he and Mr. Johnson were in the area when the crane mechanics were working on the brakes, and that brake work occurred every day or every other day. This work would sometimes take a whole day, or sometimes just an hour or two. Mr. Sperl further testified that when brake work occurred, there would be dust in the air. Mr. Sperl could not identify the source of the dust, however.

### William A. Reiter

William A. Reiter died on November 25, 2002, of carcinoma of the lung with metastasis, atrial fibrillation, hypertension, and coronary artery disease. Mr. Reiter worked at the Sparrows Point facility from 1947 to 1990 as a laborer and operator, all over the steel mill and the shipyard. Only appellee Square D is implicated in Mr. Reiter's suit.

In his deposition, Mr. Lloyd Martin testified that he was a millwright repairman for machinery in the Sparrows Point tin mill from 1955 to 1990. Mr. Martin knew Mr. Reiter from working with him at the tin mill and saw Mr. Reiter almost every day for 25 to 30 of the 35 years that Mr. Martin worked at the mill. Mr. Martin first saw Mr. Reiter at the tin mill somewhere around 1960, where Mr. Reiter was a coil preparation line operator.

Overhead cranes were used to move coils in the area where Mr. Martin and Mr. Reiter worked. Some of the cranes were "directly overhead and then spread out all over the place, really." The overhead cranes would generate dust that would come down where Mr. Reiter was working. Mr. Reiter was exposed to the crane dust "all the time" "throughout the '60s,

'70s, and '80s." When the pipe coverers worked around Mr. Reiter, their work also created dust. Mr. Martin also stated that the operation of the steel mill itself created dust in the area where Mr. Reiter worked.

Charlie Coleman, a painter at the Sparrows Point facility from approximately 1952 to 1972, stated in his deposition that the tin mill was a dirty place to work. Mr. Coleman did not know where the dirt came from that landed on the cranes in the tin mill; he stated that dust could come from "throughout the mill" or from outside.

Harold Gribble also testified as to the conditions in the tin mill. Mr. Gribble worked at the Sparrows Point facility from 1951 to 1991, first as a roll shop helper, then as a roll grinder. He worked in all the mills that made up the tin mill, including 42 skin pass, 42 tandem mill, 56 tandem mill, 66 tandem mill, 56 hot mill, and 68 hot mill, not all of which were in the same building. He stated that when the mill mechanics were working on the brakes, the air around them was "awful dusty." He stated that he could see the dust in the air, but could not identify the color. He specifically noted that dust came from the brakes when mill mechanics were working on the cranes. The brake work he described went on throughout his tenure, and he stated that crane brakes were in all the mills he worked in.

In his deposition testimony, Norman Vacovsky further described the conditions inside the tin mill. Starting in 1955, Mr. Vacovsky worked in the tin mill's washer department as a laborer. In 1966 he was promoted to supervisor, and started working in the tin mill's three tandem mills. In 1967 he was promoted again, and worked in both the tandem mills and the washer department. In 1968–69 he became a daylight foreman, working primarily in the tandem mills. He testified that there were two overhead cranes in number 3 tandem mill and two cranes shared by numbers 1 and 2 tandem mills, one overhead crane in the washer, two overhead cranes in the pickler, one crane in the each of the cold storage areas, two cranes in another of the cold storage areas, one crane in the

continuous anneal, one crane in the duo mill, and one crane in each of the skin mills. The overhead cranes ran down the center of the mills on rails. The top part of the crane was about 35 feet in the air, while the bottom of the crane was about 20 feet above the floor. Mr. Vacovsky also stated that cranes were maintained on scheduled days. Crane mechanics would "often" use air hoses to blow dust off of the equipment. When the brakes and motors on cranes were cleaned, it was done in the "hole" at one end of the building.

William Banks worked as a crane millwright in the tin mill from 1970 to 2002. He stated in his deposition that Square D was one of the suppliers of brakes that were used on the cranes in the Tin Mill. Mr. Banks knew the names of the companies that made the brakes used in the tin mill because both the brake and brake shoes were tagged with the manufacturers' names. When Mr. Banks got a new brake shoe from the supply department, the shoe was in a box from the factory. If the shoe did not have a tag on it, the supply personnel would tag it with either the name of the manufacturer or a code indicating the manufacturer. The Square D logo was visible on the side of the crane brake itself.

Henry Junius Goings worked in the 56 inch cold strip mill as a laborer from 1952 until 1967. In his deposition, he stated that electricians and millwrights would blow out the crane brakes using an air hose, making "a lot of white dust" fly in the air. The crane brakes were cleaned with the air hose at least once a week or more. From 1968 to 1990, Mr. Goings was an electrical helper mostly working in the 42 inch mill, with occasional returns to the 56 inch cold strip mill. Ninety percent of his time as an electrical helper was spent working on cranes. While in the electrical department, he personally air hosed crane motors and brakes. He testified that there were three overhead cranes in the galvanizer, two overhead cranes in the finishing mill that were about 40–45 feet above the ground, and three overhead cranes in the skin pass, which were about 45 feet above the ground.

Gerald Myers worked in the electrical department in the tin mill and sheet mill from the early 1960s until 1997. In his deposition, he stated that as an electrician, he worked on cranes and crane brakes. He recalled that Square D was one of the manufacturers of the crane brake shoes used during his time as an electrician. As an electrician, he had to adjust the crane brakes, which created dust. He also had to change the brake linings. He knew who manufactured the brake linings because they were the same as the manufacturer of the brake shoe. The brake lining itself would also be labeled; some of them would be tagged, and some would have the manufacturer's name printed into them.

### Harold R. Williams

Harold R. Williams died on October 17, 2003, of pneumonia and small cell lung cancer. Mr. Williams worked at Sparrows Point from 1964 to 1993 as a laborer, "all over the facility." Appellees Square D, Abex, and Cutler–Hammer are all implicated in Mr. Williams' suit.

In his deposition, Robert Freeman testified that he first met Harold Williams in the early 1960s when both were working in the scrap yard. After working with Mr. Freeman for one year, Mr. Williams moved to Number 3 Rod Mill. A year later, Mr. Freeman also went to Number 3 Rod Mill. In the mid–1960s, both Mr. Freeman and Mr. Williams worked in the finishing end o f Number 3 Rod Mill and were there for three or four years. Mr. Freeman worked the same shift as Mr. Williams every third week, for one week each time. Mr. Freeman worked sometimes as far as 50 or 60 yards from Mr. Williams, and sometimes closer. When Mr. Freeman and Mr. Williams worked the same shift, Mr. Freeman would see Mr. Williams 15–20 times a day. Mr. Freeman would talk to Mr. Williams whenever he needed to know where to put stock.

Mr. Freeman testified that there were two overhead cranes in Number 3 Rod Mill: one over the mill in the finishing end and one over shipping and storage. The overhead cranes were about 25–30 feet high. Mr. Freeman testified that in the finishing end, there was a lot of dust. "Whenever the crane

came overhead and jammed on the bumper, it [shook] the frame so the dust would fall." Most of the dust was airborne. Mr. Freeman and Mr. Williams were close enough to breathe the dust, and were exposed to that dust the whole time they were working in the finishing end.

## DISCUSSION

In evaluating appellant's contention that the circuit court erred in granting appellees' motions for summary judgment, we observe that summary judgment is appropriate only when, after viewing the motion and response in favor of the non-moving party, there is no genuine issue of material fact, and the party in whose favor judgment is entered is entitled to judgment as a matter of law. *Pittman v. Atl. Realty Co.*, 127 Md.App. 255, 269–70, 732 A.2d 912, *rev'd on other grounds*, 359 Md. 513, 754 A.2d 1030 (2000); Md. Rule 2–501(f). In other words, once we have concluded that there is no genuine issue of material fact, our standard of review "is whether the trial court was legally correct." *Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 591, 578 A.2d 1202 (1990). "The purpose of the summary judgment procedure is not to try the case or decide the factual disputes, but to decide whether there is an issue of fact that is sufficiently material to be tried." *Miller v. Ratner*, 114 Md.App. 18, 27, 688 A.2d 976 (1997). " 'A material fact is a fact the resolution of which will somehow affect the outcome of the case.' " *Id.* at 26, 688 A.2d 976 (citing *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985)).

"[T]he summary judgment standard is akin to that of a directed verdict, *i.e.*, whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Seaboard Sur. Co. v. Richard F. Kline, Inc.*, 91 Md.App. 236, 244, 603 A.2d 1357 (1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "The mere existence of a scintilla of evidence in support of plaintiff's claim is insufficient to preclude the grant of summary judgment; rather, there must be evidence on which the

jury could reasonably find for the plaintiff." *Id.* Thus, as we explained in *Miller*:

> [O]nce the moving party ha[s] provided the court with sufficient grounds for summary judgment, "[i]t is ... incumbent upon the other party to demonstrate that there is indeed a genuine dispute as to a material fact. He does this by *producing factual assertions, under oath,* based on the *personal knowledge* of the one swearing out an affidavit, giving a deposition, or answering interrogatories. Bald, unsupported statements or conclusions of law are insufficient."

*Miller,* 114 Md.App. at 27, 688 A.2d 976 (quoting *Lowman v. Consol. Rail Corp.,* 68 Md.App. 64, 70, 509 A.2d 1239, *cert. denied,* 307 Md. 406, 514 A.2d 24 (1986) (citations omitted)).

The test for determining the legal sufficiency of the evidence of substantial factor causation in asbestos personal injury cases was set forth by the Court of Appeals in *Eagle–Picher Industries v. Balbos:*

> Whether the exposure of any given bystander to any particular supplier's product will be legally sufficient to permit a finding of substantial-factor causation is fact specific to each case. The finding involves the interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace. This requires an understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and the bystander plaintiff. Within that context, the factors to be evaluated include the nature of the product, the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product. In addition, trial courts must consider the evidence presented as to medical causation of the plaintiff's particular disease.

326 Md. 179, 210–211, 604 A.2d 445 (1992) (citations and quotation omitted).

In *Balbos*, the Court "rejected rules for determining causation that respectively lie near opposite ends of a causation continuum. At the defense extreme, [the Court] rejected a 'but for' rule under which there would be no liability based on substantial factor exposure to a particular defendant's product if the plaintiff would have suffered the disease even without that exposure." *ACandS, Inc. v. Asner*, 344 Md. 155, 171, 686 A.2d 250 (1996) (citing *Balbos*, 326 Md. at 208, 604 A.2d 445).

"*Balbos* also rejected, at the plaintiff's end of the spectrum, the 'fiber drift theory,' " *id.* (citing *Balbos*, 326 Md. at 216–17, 604 A.2d 445), the substance of which is that " 'once an asbestos-containing product can be placed *anywhere* in [a] plant, any plaintiff working at any point within that plant is entitled to have the question of causation submitted to the jury because it is likely, given that fibers can drift, that a given plaintiff was exposed to fibers originating in a particular defendant's product.' " *Balbos*, 326 Md. at 217, 604 A.2d 445 (quoting *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 376 (1990)). In so doing, the Court stated: "So extremely attenuated is causation in fact under the 'fiber drift theory' that it is inconsistent with the requirement of Maryland law that an actor's negligence be a substantial factor in causing the injury." *Id.*

The Court of Appeals confirmed its rejection of the 'fiber drift theory' in *Georgia–Pacific Corporation v. Pransky*, 369 Md. 360, 365, 800 A.2d 722 (2002). In that case, the Court stated with regard to one of the *Balbos* plaintiffs, who had asserted liability against a defendant based on evidence that the defendant sold asbestos products that were used in parts of a shipyard where the plaintiff did not work: "The exposure must be more direct; the plaintiff must have been in or very near the presence of the asbestos-containing product and able to inhale fibers released from that product." *Id.*

■ Exposure of a plaintiff to an asbestos-containing product may be established circumstantially. *Balbos*, 326 Md. at 210, 604 A.2d 445. " 'The evidence, circumstantial as it may be, need only establish that [a] plaintiff was in the same

vicinity as witnesses who can identify the products causing the asbestos dust that all people in that area, not just the product handlers, inhaled.' " *Id.* (quoting *Roehling v. Nat'l Gypsum Co. Gold Bond Bldg. Prods.*, 786 F.2d 1225, 1228 (4th Cir. 1986)). *See also Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162–63 (4th Cir.1986) ("To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked.")

Thus, in this case, we are asked to determine whether the evidence and inferences most favorable to appellants would allow a reasonable jury to find that exposure to appellees' products was a substantial factor cause of the decedents' lung cancer. *Balbos,* 326 Md. at 210, 604 A.2d 445; *Seaboard,* 91 Md.App. at 244, 603 A.2d 1357. For the reasons that follow, we find that it would not.

### Johnson / Cutler–Hammer, Square D

In his deposition, Walter John Sperl testified as to Mr. Johnson's alleged exposure to dust created by crane brake linings. Mr. Sperl stated that he and Mr. Johnson worked as laborers in the slab yard from 1960 to 1972. Mr. Sperl stated that there were six overhead cranes in the slab yard which were at least 30 feet in the air. While Mr. Sperl did not pay attention to the work the crane mechanics did on the brakes while working overhead, he did see the crane mechanics using air hoses to blow dust off of the brakes. Mr. Sperl also stated that when the brake work took place, there would be dust in the air. He could not, however, identify the source of the dust.

In order for appellant's claim to survive a motion for summary judgment, a jury must reasonably be able to find that Mr. Sperl was in the same vicinity as Mr. Johnson, and that Mr. Sperl " 'identif[ied] the products causing the asbestos dust that all people in that area, not just the product handlers, inhaled.' " *Balbos,* 326 Md. at 210, 604 A.2d 445 (quoting *Roehling,* 786 F.2d at 1228). While Mr. Sperl's testimony

places Mr. Johnson in the vicinity of crane brakes and the dust that had accumulated on the brakes, Mr. Sperl could not identify the dust as having come from the wear of the crane brake linings. Further, Mr. Sperl could not identify the suppliers of any of the brake linings used in the slab yard. Even when viewed in a light most favorable to appellant, Mr. Sperl's testimony and the inferences reasonably drawn therefrom cannot support a finding that exposure to Cutler–Hammer or Square D products was a substantial factor cause of Mr. Williams' lung cancer.

### Williams / Abex, Cutler–Hammer, Square D

In his deposition, Robert Freeman testified as to Mr. Williams' alleged exposure to dust created by crane brake linings. Mr. Freeman stated that he worked with Mr. Williams for one year in the scrap yard and three to four years in the finishing end of Number 3 Rod Mill. Mr. Freeman stated that there were two overhead cranes in Number 3 Rod Mill; one over the mill in the finishing end and one over shipping and storage. The cranes were about 25–30 feet above the ground, and that the movement of those cranes created airborne dust. Mr. Freeman testified that he and Mr. Williams were close enough to breathe the dust, and were exposed to the dust throughout their time in the finishing end.

In order to determine whether appellant's claim can survive a motion for summary judgment, we apply the same standard as we did in the case of Mr. Johnson; a jury must reasonably be able to find that Mr. Freeman was in the same vicinity as Mr. Williams, and that Mr. Freeman " 'identif[ied] the products causing the asbestos dust that all people in that area, not just the product handlers, inhaled.' " *Balbos*, 326 Md. at 210, 604 A.2d 445 (quoting *Roehling*, 786 F.2d at 1228). While Mr. Freeman's testimony places Mr. Williams in the same facility as overhead cranes and the dust created by the operation of those cranes, Mr. Freeman could not identify the dust as having come from the wear of the crane brake linings. Further, Mr. Freeman did not identify any of the suppliers of brake linings used in the Number 3 Rod Mill. Even when

viewed in a light most favorable to appellant, Mr. Freeman's testimony and the inferences reasonably drawn therefrom cannot support a finding that exposure to Abex, Cutler–Hammer, or Square D products was a substantial factor cause of Mr. Williams' lung cancer.

## Reiter / Square D

In his deposition, Mr. Lloyd Martin testified as to Mr. Reiter's alleged exposure to dust created by crane brake linings. Mr. Martin stated that he knew Mr. Reiter from working with him at the tin mill, and that he saw Mr. Reiter almost every day for 25–30 years beginning around 1960. Mr. Martin testified that Mr. Reiter was a coil preparation line operator, and that overhead cranes were used to move coils in the area where they worked. Mr. Martin further stated that the overhead cranes would generate dust, and that Mr. Reiter was exposed to the dust "all the time." Mr. Martin also noted that the work of pipe coverers, as well as the operation of the mill itself, created dust in Mr. Reiter's work area.

Other deponents also testified as to the conditions inside the tin mill. Mr. Charlie Coleman stated that the tin mill was a dirty place to work. He did not, however, know where the dirt came from that landed on the cranes. Mr. Harold Gribble stated that when the mill mechanics were working on the crane brakes, the air around them was "awfully dusty." Mr. Norman Vacovsky stated that crane mechanics in the tin mill would often use air hoses to blow dust off of the equipment. Mr. Henry Junius Goings also testified that electricians and millwrights would clean the crane brakes with air hoses at least once a week, a process which made dust fly into the air.

In its brief, Square D concedes that appellants' evidence "places a Decedent and a Square D crane brake in the same overarching facility (such as the Tin Mill)." This is corroborated by deposition testimony. Specifically, Mr. William Banks testified that Square D was one of the suppliers of brakes that were used on the cranes in the Tin Mill. Mr. Gerald Myers also recalled that Square D was a supplier of crane brake shoes used in the mill. He said that he knew

which replacement lining to use when changing brake linings because the manufacturer of the brake linings was the same as the manufacturer of the brake shoes.

Square D's concession and the testimony of Mr. Banks and Mr. Myers permits an inference that Square D products were present in the Tin Mill during Mr. Reiter's tenure there. This, however, is not enough to create a genuine issue of material fact as to whether Square D's products were a substantial factor cause of Mr. Reiter's lung cancer. While Square D crane brakes may have been used in the tin mill, there was no testimony that Square D was the exclusive supplier of crane brakes in that mill. Indeed, there were approximately a dozen different manufacturers' crane brake assemblies used in the various Sparrows Point facilities. Further, and as explained *supra,* the tin mill was made up of several other mills, covering an area of approximately 480 acres. The most that can be shown is that there is some probability that a Square D brake assembly was located somewhere in the tin mill at the same time that Mr. Reiter was also in the mill. To infer from that information that Mr. Reiter was exposed to Square D brake linings that were expelling respirable asbestos fibers with the proximity, regularity, and frequency required by *Balbos* would be speculation, at best. Square D simply cannot be found liable for Mr. Reiter's lung cancer without evidence linking his exposure to dust generated by the wear of Square D brake linings. *See Lee v. Baxter Healthcare Corp.,* 721 F.Supp. 89, 93 (1989) ("Maryland courts apply traditional products liability law which requires the plaintiff to prove that the defendant manufactured the product which allegedly caused the injury.") To hold otherwise would amount to a recognition of the theory of market share liability [2], which the Maryland Court of Appeals

---

2. The theory of market share liability was fashioned by the California Supreme Court in *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, *cert. denied,* 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980). In *Lee,* 721 F.Supp. at 93, the United States District Court for the District of Maryland explained the theory as follows:

has declined to adopt. *Id.* The circuit court, therefore, did not err in granting appellees' motions for summary judgment.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**

In *Sindell,* the plaintiff alleged that she developed a malignant bladder tumor as a result of her mother's ingestion of DES during pregnancy. Plaintiff recovered against eleven drug companies, although she was unable to identify which manufacturer produced the drug which caused her injury. The court found that the defendants, taken together, provided 90% of the drug to the market during that period, and that they knew or should have known that DES was a carcinogenic substance but failed to warn the public of its potential danger. The burden of showing causation shifted to the defendants to prove their innocence. Each defendant was unable to prove that it did not produce the DES which caused the harm, and the court held each liable according to its proportion of the market.