8 A.3d 725

Catherine L. **REITER** et al.

v.

**PNEUMO ABEX, LLC** et al.

**No. 72, Sept. Term, 2008.**

Court of Appeals of Maryland.

Nov. 19, 2010.

Michael T. Edmonds (Timothy J. Hogan of Law Offices of Peter T. Nicholl, Baltimore, MD), on brief, for petitioners.

Steven J. Parrott (Laura M. Higgs of DeHay & Elliston, L.L.P., Baltimore, MD), on brief for respondents.

Neil J. MacDonald (Helyna M. Haussler of Hartel, Kane, DeSantis, MacDonald & Howie, LLP, Beltsville, MD), on brief, for respondents.

Warren N. Weaver (James R. Benjamin, Jr. of Whiteford, Taylor & Preston, L.L.P., Baltimore, MD), on brief, for respondents.

F. Ford Loker, Douglas B. Pfeiffer, Laura A. Cellucci, Amanda Neidert, Baltimore, for Amicus Curiae brief of GTE Products of Connecticut Corporation.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, LAWRENCE F. RODOWSKY (Retired, specially assigned) and ALAN M. WILNER (Retired, specially assigned), JJ.

MURPHY, J.

The Petitioners in the case at bar are the widows of steelworkers who were employed by the Bethlehem Steel Corporation at its Sparrows Point facility ("facility"),[1] and the Respondents are corporations that supplied products containing asbestos to the facility.[2] In the Circuit Court for Baltimore City, Petitioners—in their individual and representative capacities—filed complaints in which they asserted that their

---

**1.** Petitioner Charlotte J. Johnson is the Personal Representative of the Estate of William H. Johnson; Petitioner Catherine L. Reiter is the Personal Representative of the Estate of William A. Reiter; and Petitioner Arlene Williams is the Personal Representative of the Estate of Harold R. Williams.

**2.** The Respondents are Eaton Corporation ("Eaton") (successor in interest to Cutler–Hammer, Inc. ("Cutler–Hammer")), Pneumo Abex LLC ("Abex"), and Square D Company ("Square D"). Abex manufactured and sold asbestos-containing automotive friction products including brake lining and pads under different trade names from approximately 1927–1987. Abex brake linings were used in the brake assembly systems manufactured by Westinghouse as well as Square D. Cutler–Hammer manufactured and sold certain products that contained asbestos components from approximately 1920–1984. Square D also manufactured and sold crane braking equipment from 1955–2004. Prior to the mid 1980's some of their braking equipment components contained some quantity of encapsulated asbestos.

husbands died from lung cancer caused by exposure to the asbestos contained in the products supplied by the Respondents. The Petitioners' cases were among the cases "consolidated" into two groups: (1) the "Adams" Group, which included decedents William A. Reiter and Harold R. Williams; and (2) the "Conyers" Group, which included decedent William H. Johnson. At the conclusion of a two day motions hearing, the Circuit Court granted Respondents' motions for summary judgment, and entered judgment against each of the Petitioners.

Petitioners noted an appeal to the Court of Special Appeals, and that court affirmed the judgment of the Circuit Court. *Reiter v. ACandS, Inc.*, 179 Md.App. 645, 947 A.2d 570 (2008). Petitioners then filed a petition for writ of certiorari in which they requested that this Court answer the following questions:

I. Whether the grant of summary judgment dismissing [Petitioners'] asbestos injury claims as a matter of law on the issue of substantial factor causation constitutes error where [Petitioners] presented evidence that asbestos-containing crane brakes of the [Respondents] were present throughout the areas where [Petitioners] worked and that [Petitioners] worked in the vicinity of those crane brakes when the crane brakes emitted asbestos-containing dust to which [Petitioners] were exposed[?]

II. Whether the grant of summary judgment dismissing [Petitioners'] asbestos injury claims as a matter of law on the issue of substantial factor causation constitutes error where the court requires direct testimonial evidence of specific exposures and ignores circumstantial evidence of such exposures[?]

III. Whether the grant of summary judgment dismissing [Petitioners'] asbestos injury claims as a matter of law on the issue of substantial factor causation constitutes error where the grant of summary judgment is based on the theory of market share liability and the evidence demonstrated that [Respondents'] asbestos-containing products were in place where [Petitioners] worked and that these

products emitted dust to which [Petitioners] were exposed[?]

We granted the petition. 405 Md. 506, 954 A.2d 467 (2008). From our review of the record, we conclude that Petitioners' evidence was sufficient to generate a jury issue on the question of whether (1) each decedent was exposed to asbestos dust at his workplace, and (2) Respondents manufactured some of the crane brake products used at the facility. We also conclude, however, that Petitioners' evidence was insufficient to establish that any of the Respondents' products were used at the *specific site(s)* where the Petitioners *actually worked.* We shall therefore affirm the judgment of the Court of Special Appeals.

### Factual Background

The record includes the following information about the decedents:

**William H. Johnson,** who worked as a laborer in the slab yard from 1960–1972, died of lung cancer on May 16, 2003. Respondents Square D and Cutler–Hammer are implicated in his suit. Mr. Johnson was never deposed. Mr. Johnson's only fact-specific witness was Mr. Walter John Sperl ("Mr. Sperl"). Although he occasionally worked with Mr. Johnson at other locations in the facility, Mr. Sperl testified that the only location at which Mr. Johnson worked with any frequency or regularity was the area of the slab yard adjacent to the 56–Inch Hot Strip Mill. This area was the size of nearly three football fields.

**William A. Reiter,** who worked in the tin mill from 1947–1990, died on November 25, 2002 from carcinoma of the lung, atrial fibrillation, hypertension and coronary heart disease. Only Square D is implicated in his suit. Mr. Reiter was never deposed. The only fact-specific witness deposed in Mr. Reiter's case was Mr. Lloyd Martin ("Mr. Martin"). Mr. Martin began working with Mr. Reiter at the tin mill sometime in 1960 when Mr. Reiter held a ground level position in the tin mill as a line worker in the coil prep line. According to Mr. Martin, Mr. Reiter never worked at

any location of the tin mill other than the coil prep line. The tin mill itself accounted for nearly 480 acres of the entire Sparrows Point facility. The coil prep line accounted for 50 square feet of this area.

**Harold R. Williams,** who worked as a laborer at the facility from 1964–1993, died on October 17, 2003 of pneumonia and small cell lung cancer. Square D, Abex, and Cutler Hammer are all implicated in Mr. Williams' suit. The only witness deposed in Mr. Williams' suit was Robert Freeman ("Mr. Freeman"), who testified at his deposition that beginning in the early 1960's he worked with Mr. Williams in the scrap yard. By the mid 1960's both men were assigned to work at the "finishing end" of the Number 3 Rod and Wire Mill. Mr. Freeman stated that he and Mr. Williams would see each other roughly 15–20 times per day and that Mr. Williams' job duties were performed exclusively at the finishing end. The finishing end of the Number 3 Rod and Wire Mill was an area that was the size of nearly three football fields.

The record includes the following product identification evidence:

**Slab Yard:** Joe Burlock, who worked at the blooming mills and the slab yards from 1964–1985, testified that Cutler–Hammer and Square D brake linings were used on the crane brakes throughout the site during this time. Eddie Hawkes, who worked as a crane operator in the slab yard from 1964–1975, identified both Cutler–Hammer and Square D braking systems on crane brakes at these mills throughout the period that he worked there.[3] William Devilbiss, who worked at the blooming mills and slab yards as well as the hot strip mills from 1964 through the 1980's, testified that Cutler–Hammer brake linings were used at these sites during this period of time.

**Tin Mill:** Gerald Myers, who worked in the tin mill from the early 1960's through the 1980's, testified that Square D

---

**3.** Eddie Hawkes was one of the plaintiffs whose claims against the Respondents were allowed to proceed to trial.

brake linings were used at that site during this period of time. Bobby Sherrod, who worked in the tin mill from 1975–1985, testified that Square D brake linings were used at that site during the entire time that he worked there. James Tent, who worked at the tin mill from 1970–1972, testified that Square D brake linings were used on the crane brakes at that site during this period of time.

**Rod and Wire Mills:** Neil White, who worked in one of the three rod & wire mills from 1959 into the 1980s, identified Westinghouse (Pneumo Abex) crane brake linings, Square D brake linings, and Cutler–Hammer brake linings in the mill throughout that period of time. Frank Mortis, who worked from 1970 to 2003 as an electrician throughout the facility, identified crane brake units supplied by Cutler–Hammer and Square D.

The record shows that, while granting motions for summary judgment in the Petitioners' cases, and denying the Respondents' motions for summary judgment in cases involving other plaintiffs, the Circuit Court delivered an oral opinion that included the following findings and conclusions:

The Court is mindful of the case law which has been adverted to by all parties concerned, in particular the *Balbos* case, and would note that in *Balbos,* the Court of Appeals adopted what is known as the frequency, regularity, and proximity test to determine the legal sufficiency of evidence of substantial factor causation in asbestos personal injury cases.

And *Balbos* makes it clear that when the exposure of any given bystander, and in all instances, the plaintiffs in these cases are bystanders, whether the exposure of any given bystander to any particular supplier's product will be legally sufficient to permit a finding of substantial factor causation is fact specific to each case . . .

While each of the overhead cranes, without dispute, had multiple braking systems, these brakes were not located anywhere close to the average worker in these cavernous facilities; rather, the brakes were located dozens of feet off

the ground and were in some instances five, maybe eight stories high in some locations.

Taking into account the massive cavernous size of the facilities as well as the distance from laborers to the braking systems on the cranes, plaintiffs have ... failed to show that workers were sufficiently proximate to or in the vicinity of the crane brakes to be considered in or very near the presence of asbestos-containing products and able to inhale fibers released from the products, as the Court of Appeals indicated in *Georgia–Pacific* [*v.*] *Pransky,* 369 [Md.] 360 [800 A.2d 722], [a] 2002 case. . . .

In other case law which I think is relevant to advert to at this point and which is relied upon heavily by each of the defendants with reference to the bystander cases before the Court, *Lohrmann* tells us that to support a reasonable inference of substantial factor causation from circumstantial evidence, and in large measure, these cases [are] circumstantial evidence cases, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked.

To support a reasonable inference of substantial factor causation of a crane brake as to an asbestos-related disease, plaintiffs must do more than simply place themselves in the same massive facility in which overhead cranes were utilized and must do more than simply show that they or co-workers saw cranes being utilized overhead and that they helped to hook up or load—hook up loads onto cranes, they must demonstrate that they were proximate to or in the vicinity of a particular manufacturer's crane brakes at a time when such might have been expelling respirable fibers. . . .

Therefore, concluded as to those plaintiffs who did not work specifically on or adjacent to overhead crane brake systems or did not work regularly on the overhead cranes themselves failed to satisfy the proximity prong of the *Balbos* test as well as prescribed under the Maryland law.

Therefore, the claims of such plaintiffs, in viewing all the facts and inferences in a light most favorable to them, amount essentially to fiber drift claims.

Such plaintiffs have not submitted evidence, any evidence, no matter how attenuated or circumstantial, that would allow this Court to strain to permit their claims to survive the summary judgment.

With respect to the motions of summary judgment of the [ ] direct defendants here today are granted as to Plaintiffs ... William A. Reiter, ... Harold R. Williams, [and] William H. Johnson.

Additionally, even assuming arguendo that these plaintiffs could satisfy the proximity prong of *Balbos*, they still failed the separate frequency and regularity requirements of the *Balbos* test based upon what has been presented.

Further, even if they were able to satisfy the frequency, proximity and regularity requirements of *Balbos*, the claims still fail as to their arguments in this context as presented amount to really market share liability which is not recognized under Maryland law.

As to the various plaintiff and co-worker testimony, cannot, does not, has not placed these plaintiffs in the vicinity of or proximate to any specific manufacturer's product at specific points in time.

With respect to those plaintiffs working directly on or adjacent to, truly in the vicinity of the crane brakes the Court has concluded otherwise.

Those individuals include Plaintiff James Crudup who was a laborer and electrician between 1952 and 1992, whose work involved cleaning up dust and debris throughout the mills and working in close proximity to the electricians and millwrights those workers who would be more directly working with the crane break, the asbestos-containing brake linings, removal and such, repair and adjustments.

On a weekly basis there's evidence that Mr. Crudup used his air hose to blow out the brakes, he was in the immediate

area when the brakes were blown out and dust accumulated in the brake systems was released into the atmosphere.

As to Plaintiff Eddie Hawkes who the Court understands to have been a laborer between 1946 and I believe 1975 who worked inside and outside the crane [ ] themselves, he indeed was a crane operator at—I believe it's the blooming mills for a period of 1952 to '64, I'm satisfied the standards test is shown and satisfied.

With respect to Mr. Howard, Freddie Howard who is a painter who worked between 1940 and 1983, according to the evidence presented and shown by the plaintiffs his primary job was to clean the dust off of and paint the many cranes throughout the many buildings, facilities near—he was near the repairmen, again, primarily electricians and millwrights working on fixing, dealing with the brake linings which are the asbestos-containing products at issue here, the dust created by the repairs being done and is the person most clearly shown to have been working with the electricians.

Taking into account both the finite number of cranes in the different facilities as well as the typically long tenure of the plaintiffs just noted at the particular facilities where they were employed, it's reasonable to infer in those specific instances in the former Adams now Conyers group that such plaintiffs worked on or closely adjacent to all the crane brakes in a given facility, meaning a particular building at Sparrows Point and did so regularly and frequently.

This combined with the plaintiff and co-worker testimony placing asbestos-containing crane brake linings by specific manufacturers at specific Sparrows Point facilities, particular mills, leads the Court to infer, at least for summary judgment purposes, that these plaintiffs indeed worked proximately and frequently and regularly around all the crane brakes of all manufacturers identified at particular facilities at Sparrows Point.

Again this differs from the laborers and the other workers against whom summary judgment has been granted by the court, assuming arguendo that those laborers and work-

ers could satisfy the *Balbos* test, there's been no showing that they worked in the vicinity of every crane brake at the Sparrows Point facility.

As stated above, after the judgment of the Circuit Court was affirmed by the Court of Special Appeals, this Court issued a writ of certiorari to address the Petitioners' questions.

## Discussion

 The following standard of review is applicable to the case at bar:

Whether summary judgment was granted properly is a question of law. The standard of review is de novo, and whether the trial court was legally correct. *See Walk v. Hartford Casualty*, 382 Md. 1, 14, 852 A.2d 98, 105 (2004). Maryland Rule 2–501(e) states that a trial court "shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." In reviewing a grant of summary judgment under Rule 2–501(e), we independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law. *Jurgensen v. New Phoenix*, 380 Md. 106, 114, 843 A.2d 865, 869 (2004). We review the record in the light most favorable to the non-moving party and construe any reasonable inferences which may be drawn from the facts against the movant. *Id.*

To survive a motion for summary judgment, there must exist not just a dispute as to any facts, but rather as to facts which are material, i.e. necessary to the determination of the case. *Remsburg v. Montgomery*, 376 Md. 568, 580, 831 A.2d 18, 25 (2003); *Lippert v. Jung*, 366 Md. 221, 227, 783 A.2d 206, 209 (2001); *Beatty v. Trailmaster*, 330 Md. 726, 737, 625 A.2d 1005, 1011 (1993).

*Livesay v. Baltimore County,* 384 Md. 1, 9–10, 862 A.2d 33, 35 (2004).

In *Eagle–Picher Industries v. Balbos,* 326 Md. 179, 604 A.2d 445 (1992), this Court stated:

Whether the exposure of any given bystander to any particular supplier's product will be legally sufficient to permit a finding of substantial-factor causation is fact specific to each case. The finding involves the interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace. This requires an understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and the bystander plaintiff. *See, e.g., Rotondo v. Keene Corp.,* 956 F.2d 435 [436] (3d Cir. 1992) [1992 Asbestos Lit.R. (Andrews) 24, 745]. Within that context, the factors to be evaluated include the nature of the product, the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product.

*Balbos,* 326 Md. at 210, 604 A.2d at 460.

The Respondents were not entitled to summary judgment on the ground that the decedents did not work "directly on" or "immediately adjacent to" crane brakes.[4] In *ACandS v. Godwin,* 340 Md. 334, 667 A.2d 116 (1995), the plaintiff alleged that his asbestosis was caused by exposure to block and pipecovering insulation called "Unibestos" when he walked past several large furnaces five to six times per shift on a daily

---

4. Although the Circuit Court's opinion included a "hands on" or "adjacent to" analysis, the case at bar is not one in which the Petitioners are entitled to a reversal on the ground that an appellate court should ordinarily consider only the grounds relied upon by the trial court in granting summary judgment. *See, e.g., Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726, 729 (2001); *PaineWebber v. East,* 363 Md. 408, 422, 768 A.2d 1029, 1036 (2001). In its opinion, the Circuit Court expressly concluded that the Petitioners' evidence "cannot, does not, has not placed these [decedents] in the vicinity of or proximate to *any specific manufacturer's product at specific points in time."* (Emphasis supplied). That conclusion is the basis for our affirmance.

basis. The evidence showed that, nearly everyday, at least one of the furnaces would need to be relined with new insulation. Under these circumstances, although the plaintiff *never* "worked hands on" with the insulation, this Court stated:

> The foregoing evidence sufficiently supports a finding that exposure to Unibestos was a substantial cause of McNeil's asbestosis. Bethlehem employees continually removed and reapplied insulation to the furnaces in No. 4 Open Hearth. For more than twenty years, McNeil worked outside the partially open-sided No. 4 Open Hearth building and was required to enter it five to six times a day.

*Id.,* 340 Md. at 353, 667 A.2d at 125.

From our review of the Circuit Court's on-the-record opinion, we reject the Petitioners' argument that the Circuit Court erroneously required "direct testimonial evidence" and/or ignored "circumstantial evidence." We also reject the Petitioners' argument that the Circuit Court's "grant of summary judgment [was erroneously] based on the theory of market share liability." The case at bar is a "circumstantial evidence" case in which the Petitioners were required to present evidence of exposure to a *"specific product* [made or manufactured by the Respondents] on a regular basis, over some extended period of time, in *proximity to where the [decedents ] actually worked."* Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1162–1163, (4th Cir.1986) (Emphasis supplied). Even though they are unable to present "direct" product identification testimony, the Petitioners argue (in the words of their brief):

> ... In these cases [they] did not merely show that Respondents' crane brakes emitted dust someplace [in the facility] which drifted throughout the mill.... Instead Petitioners presented evidence that each Petitioner was exposed to dust from crane brakes over a period of years at **specific sites** and presented evidence of each Respondents crane brakes at those sites when Petitioners worked there.

■ We hold that the "specific site" where each decedent worked was the limited area in the facility where the decedent was located on a day-to-day to basis. While a "boiler room" or an "engine room" may constitute a specific site, a factory the size of an airplane hanger does not. In *Balbos, supra,* this Court stated:

"In *Blackston* [*v. Shook & Fletcher Insulation Co.,*] (11th Cir.1985), 764 F.2d 1480, the plaintiff had been a pipefitter for thirty-five years, but the case involved only two years of that period during which the plaintiff worked on the construction of a paper mill in Georgia. The defendant, one of the contractors on that job, used the asbestos product in question, but the plaintiff's evidence 'did not show that he was working **in the vicinity** [where] it was being used.'" *Id.* at 1481.

*Robertson v. Allied Signal* [*Inc.,* 914 F.2d 360, 367–68 (3d Cir.1990) ] presented the claims of workers at a tire manufacturing facility where the principal activity took place in a building three levels high with a total area of 862,000 square feet. One of the defendants, Allied Signal, made the asbestos brakes used on certain cutting machines in the stock-cutting area. The trial court had granted summary judgment for Allied Signal. That judgment was reversed as to one plaintiff whose job was to run the mill that supplied the cutters, so that that plaintiff worked in proximity to the cutters for seven years. Judgment for Allied Signal was affirmed as to the other plaintiffs who worked **elsewhere in the building.**

The size of the tire manufacturing facility in *Robertson* was used to distinguish that case in *Rotondo v. Keene Corp.,* 956 F.2d at 441 [1992 Asbestos Lit R. at 24,750]. Rotondo was a welder at the Philadelphia Naval Shipyard in 1942–43. The defendant manufactured an asbestos pipe covering called "Ehret." In reviewing a judgment for the plaintiff, the Third Circuit applied governing Pennsylvania law, as enunciated in *Eckenrod v. GAF Corp.* [375 Pa.Super. 187], 544 A.2d 50 [ (1988) ], where

"[t]he court stated that 'a plaintiff must establish more than the presence of asbestos in the workplace; he must prove that he worked **in the vicinity of the product's use.**' In particular, a plaintiff must present evidence 'to show that he inhaled asbestos fibers shed by the specific manufacturer's product.' The relevant evidence is 'the frequency of the use of the product and the regularity of the plaintiff's employment in proximity thereto.' " 956 F.2d at 439 [1992 Asbestos Lit.R. at 24,748] (quoting 544 A.2d at 52–53 (citations omitted)).

Those requirements were satisfied in *Rotondo* for the following reasons:

"In summary, the testimony introduced in the instant case did not merely place Ehret pipecovering 'somewhere' in a large facility, but rather placed it **in the specific area (i.e., the boiler room)** in which Rotondo worked. In addition, the evidence established that Rotondo worked in the boiler room of the Monticello at least 2 days a week for at least 3 to 4 months during the summer of 1942, and that the pipecoverers used the Ehret product fifty percent of the time." 956 F.2d at 442 [1992 Asbestos Lit.R. at 24,751]. The facts in the cases before us are quite similar to those in *Roehling v. National Gypsum*, 786 F.2d 1225 [(1986)]. The plaintiff was a pipefitter who for six months had worked on the construction of new boilers at the power station of an industrial plant. He did not apply insulation, a task done by asbestos installers who followed behind in the progress of the work. The boiler walls were insulated with asbestos block and then covered with asbestos cement. An insulator-helper testified that " 'tons of' " the defendant's cement were used on the boiler walls. *Id.* at 1227. Summary judgment for the cement supplier was reversed because the facts and underlying inferences established that the plaintiff **"worked in the same limited area of the plant, at the same time"** as the insulators "working side by side." *Id.* at 1228.

*Balbos*, 326 Md. at 211–212, 604 A.2d at 460–461. (Emphasis supplied).

■ Applying these holdings to the case at bar, Mr. Johnson's specific work site was the area of the slab yard adjacent to the 56–Inch Hot Strip Mill (still around 3 football fields in length); Mr. Reiter's specific work site was the 50 square feet of the tin mill reserved for the coil prep line; and Mr. Williams's specific work site was the finishing end of the Number 3 Rod Mill (also nearly 3 football fields in length).

Petitioners argue that the factual scenario(s) presented in this appeal are nearly identical to those present in *McNeal v. Eaton Corp.*, 2002 PA Super 281, 806 A.2d 899 (2002). There is no merit in that argument. In *McNeal,* the plaintiff, who worked at an industrial facility as a welder, asserted that he was exposed to asbestos from dust created through the operation of Cutler–Hammer brakes. His exposure evidence was presented through the testimony of a coworker, who testified that he saw the plaintiff working around the cranes (suspended roughly 25 feet above him) while the cranes were repaired with Cutler–Hammer and Clark brake products. In the case at bar, however, although the testimony of each "plaintiff-specific" witness was sufficient to show that (1) each decedent worked near a crane, and (2) that each decedent worked close enough to the crane to breathe in the dust emitted from the cleaning of the crane brakes, it is undisputed that the plaintiff-specific witnesses did not identify any of the suppliers of the asbestos products at the "specific sites" where the decedents worked.

As the Court of Special Appeals stated:

The dimensions of the tin mill are illustrative of the sheer size of the Sparrows Point facility. The tin mill alone was one and one-half miles long and one-half mile wide, covering an area of 480 acres or 20,908,800 square feet. The tin mill was, in turn, made up of several other mills, not all of which were in the same building. These mills included the 42 skin pass, 42 tandem mill, 56 tandem mill, 66 tandem mill, 56 hot mill, and 68 hot mill.

The slab yard (included the 40 inch mill, the 40 by 80 slab mill and the 45 by 90 slab mill), the 56 inch and 68 inch hot

strip mills, the pipe mills, the 56 inch cold strip mills, the tin mill, the 54 inch mill, three rod and wire mills, the blooming mills, the 160 inch plate mill, the 60 inch plate mill, the blast furnace, four open hearths, the 56 inch sheet mill, the 66 inch sheet mill, and the coke ovens.

The Number 3 Rod and Wire mill was also at least three football fields in length, and the mills on the finishing side of the facility were said to be the size of small towns.

*Reiter,* 179 Md.App. at 650, 947 A.2d at 573 (2008). The size of these areas are in no way analogous to the engine room in *Balbos* or the boiler room in *Rotondo.*

Mr. Reiter worked on a daily basis in the 50 square feet of the tin mill reserved for the coil prep line. His plaintiff-specific witness testified that overhead cranes were used to move coils in the area where he and Mr. Reiter worked, and that the cranes would generate dust that they would breathe in. This testimony, however, does not establish that a Square D product was used on the cranes at that specific site. Evidence that some Square D products were used *somewhere* in the 480 acre tin mill does not establish that a Square–D product was on the crane that was in the 50 square feet where Mr. Reiter "actually worked."

Mr. Williams's plaintiff-specific witness testified as follows. There were two overhead cranes in the Number 3 Rod and Wire Mill—one over the finishing end and one over the shipping and storage end. The cranes were about 25–30 feet high, and "whenever the crane came overhead and hammed on the bumper dust would fall." He and Mr. Williams were both close enough to breathe in the dust. No witness, however, can identify which Respondent's asbestos product was used on the crane at the specific site where Mr. Williams worked.[5]

Mr. Johnson's plaintiff-specific witness testified as follows. He saw crane mechanics work on the brakes, that airhoses would be used to clean off the brakes, and that both he and

---

5. The record shows that there was only one crane located near the finishing end of the Number 3 Rod and Wire Mill.

Mr. Johnson would be in the area when this work was done—sometimes working directly underneath the crane itself. There were, however, at least six different cranes located in the slab yard. Under these circumstances, the evidence is insufficient to establish that Cutler–Hammer or Square D products were used on the cranes located at or near the "specific site" where Mr. Johnson "actually worked" (the area of the slab yard next to the 56 Inch Hot Strip Mill).

As stated above, the Circuit Court denied the Respondents' motions for summary judgment with respect to those Plaintiffs who presented deposition testimony that was legally sufficient to establish both that (1) they were close enough to the dust emitted from the crane brakes, and (2) the Respondent's products were used at the "specific site" or sites where each actually worked. The record shows that Mr. Hawkes testified as follows during his deposition:

DEFENDANTS' COUNSEL: And did you see the name Mark, Square D, or Cutler–Hammer on any of the brake shoes themselves?

MR. HAWKES: Yes, they were tagged.

DEFENDANTS' COUNSEL: Where?

MR. HAWKES: On the brake shoes, and also they were stamped. Some of them were stamped.

DEFENDANTS' COUNSEL: What were the brake shoes stamped with?

MR. HAWKES: Looked like with a stamp.

Mr. Crudup's plaintiff specific witness testified as follows:

Q: Either from your time as a laborer or from your time in the electrical department do you recall the names of the manufacturers of any of the electrical equipment we've been discussing today?

A: I remember General Electric and Westinghouse. There was some more I just can't think.

Q: Fair enough. How do you remember the General Electric?

A. Well, the way you look, you would see the name would be on top of that.

Q: Do you know—getting back to [Counsel's] point, like what time frame was it that you first started noticing the General Electric name on the Equipment?

A: Well mostly working around the mills, cleaning the mills, we would have to clean all around them and you could see the name.

Q: Tell us what you know about—you identified Westinghouse as one of the manufacturers ... What sort of equipment did you see the Westinghouse name on?

A: Motors, Westinghouse motors, Westinghouse panels.

Q: And when Mr. Crudup was a laborer, did he—to what extent did he work around the Westinghouse equipment?

A: The same as I did.

Q: And would your answer be the same with regard to the General Electric Equipment?

A: Yes.

Because the record shows that Abex products went into Westinghouse motors, a reasonable trier of fact could reasonably infer that Mr. Crudup was exposed to an asbestos product supplied by Respondent Abex.

Although Mr. Howard's plaintiff-specific witness was never asked to identify any of the suppliers of the break pads, his testimony was sufficient to establish that Mr. Howard painted cranes everywhere in the facility, and therefore "actually worked" at "specific sites" where the Respondents' products were used.

Unlike the product identification testimony available to the plaintiffs who prevailed at the motions hearing, the Petitioners' product identification testimony was insufficient to support a reasonable inference that any of the Respondents' products were used at the specific sites where Mr. Reiter or Mr. Williams or Mr. Johnson actually worked. Moreover, every general product identification witness testified on deposition that the brake linings, pads, and shoes were *not* inter-

changeable. According to these witnesses, Cutler–Hammer products had to be replaced with Cutler–Hammer products, Square–D with Square–D, and Abex with Abex. This testimony makes the case at bar distinguishable from *ACandS v. Godwin*, 340 Md. 334, 667 A.2d 116 (1995), which involved interchangeable asbestos products.

### Conclusion

Although the Petitioners' evidence was sufficient to generate a jury issue on the question of whether each decedent was exposed to asbestos dust at the specific site where the decedent actually worked, we hold that the Petitioners' evidence was insufficient to generate a jury issue on the question of whether any of the Respondents' products were used at the specific site where the decedent actually worked. Under these circumstances, the Respondents were entitled to summary judgment with respect to the claims asserted against them by the Petitioners.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY PETITIONERS.**