*Wallace & Gale Asbestos Settlement Trust v. William Edward Busch, Jr., Et Ux.*, No. 1055, Sept. Term 2017.  Opinion filed on September 26, 2018, by Berger, J.

PRODUCTS LIABILITY - ASBESTOS - BYSTANDER EXPOSURE - SUBSTANTIAL FACTOR CAUSATION - PRODUCT IDENTIFICATION

Although no direct evidence was presented that the defendant's installers used asbestos-containing materials at a particular site, the evidence was sufficient to go to the jury when documentary evidence demonstrated that the defendant did a significant amount of insulation work at the site, some insulation work included asbestos-containing materials, and the plaintiff was exposed to asbestos-containing materials.  A fact-finder could have reasonably inferred that, based upon the number of hours the defendant performed insulation services at the site, it was more likely than not that the defendant was responsible for the installation of the asbestos-containing insulation as well.

EVIDENCE - OPENING THE DOOR DOCTRINE

The defendant admitted into evidence various documents relating to the history of the current lawsuit as well as other asbestos litigation, which identified for the jury all of the defendants initially named in the plaintiffs' initial Complaint, as well as all entities that had gone bankrupt over the prior twenty-five years and could not be named, and all parties who were thought by the plaintiffs to be responsible for contributing to the development of his mesothelioma at various stages of the litigation.  In response, the plaintiffs sought to admit the stipulation of dismissal for defendant McCormick.  The circuit court did not abuse its discretion by applying the "opening the door doctrine" and permitting the plaintiffs to inform the jury that McCormick had been dismissed as a defendant in order to allay potential confusion.

EVIDENCE - RELEVANCE

The circuit court did not err by permitting the plaintiffs to introduce evidence relating to the defendant's work at a particular site outside the time period that a plaintiff worked on the site when the extent of work performed by the defendant at the site was a significant issue at trial.

JURY INSTRUCTIONS

The circuit court did not err by declining to propound a requested jury instruction on fiber drift theory.  The plaintiffs did not advance a claim based upon fiber drift.  Rather, the plaintiffs focused only on exposure in the boiler room.  The requested fiber drift instruction was not generated by the evidence.

The circuit court did not err by declining to propound requested jury instructions about the evidentiary weight of the plaintiffs' interrogatory responses and statements in the plaintiffs'

complaints.  The circuit court explained why, in its view, the requested instructions could cause confusion for the jury.  The Court of Special Appeals held that the circuit court acted within its discretion when crafting an instruction slightly different from the specific text proposed by the defendant.

Circuit Court for Baltimore City
Case No. 24-X-16-000151

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1055

September Term, 2017

WALLACE & GALE ASBESTOS
SETTLEMENT TRUST

v.

WILLIAM EDWARD BUSCH, JR., ET UX.

Kehoe,
Berger,
Beachley,

JJ.

Opinion by Berger, J.

Filed: September 26, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

Following a 14-day trial, a jury returned a verdict in the Circuit Court for Baltimore City in favor of William Edward Busch, Jr. ("Busch"), appellee, and his wife Kathleen.[1] The jury found that Busch suffered from mesothelioma caused by exposure to asbestos-containing insulation products installed by Wallace & Gale Co. ("W&G") during the construction of Loch Raven High School ("LRHS"). Busch worked as a steamfitter during the construction of LRHS. W&G was the predecessor to Wallace and Gale Asbestos Settlement Trust ("WGAST"), appellant.

In this appeal, WGAST presents two questions[2] for our consideration, which we have rephrased as five questions as follows:

> I.  Whether there was legally sufficient evidence to support a rational inference of causation.
>
> II. Whether the circuit court erred and/or abused its discretion by permitting Busch to introduce evidence relating to the dismissal of McCormick Asbestos Company from the lawsuit.
>
> III. Whether the circuit court erred and/or abused its discretion by permitting Busch to introduce evidence of W&G's

---

[1] Because Mr. and Mrs. Busch share a surname, we refer to Mrs. Busch by her first name for the purposes of clarity and out of no disrespect. We refer to the plaintiffs-appellees collectively as "Busch."

[2] The questions, as presented by WGAST, are:

> 1. Did the Circuit Court err by denying WGAST's motions for judgment asserting insufficient evidence of causation-in-fact and substantial-factor causation?
>
> 2. Did the Circuit Court err by admitting evidence and instructing the jury in ways that allows the jury to find liability based on immaterial facts?

insulation work at LRHS during a broader period of time than when Busch actually worked on the site.

IV.      Whether the circuit court erred and/or abused its discretion by declining to propound WGAST's requested jury instruction on fiber drift.

V.      Whether the circuit court erred and/or abused its discretion in association with its instructions about interrogatory responses and statements in the Complaints.

For the reasons explained herein, we shall affirm.

## FACTS AND PROCEEDINGS

Busch is a 69-year-old retired steamfitter. Busch began working as an apprentice steamfitter in 1967. Throughout his career, Busch worked for Lloyd E. Mitchell, Honeywell Corporation, and J.F. Fischer. At J.F. Fischer, Busch advanced to the position of project manager and department head.

Busch worked on many construction projects throughout his career, including the construction of Mercy Hospital, a building at the Edgewood Arsenal, the Mercantile Bank & Trust Building in downtown Baltimore, the BlueCross/BlueShield building in Towson, LRHS, the Frederick Towne Mall, the USF&G Building (now the Transamerica Building) in downtown Baltimore, Old Mill High School in Anne Arundel County, and residential projects, among others. As a steamfitter, Busch installed HVAC equipment.

Busch was employed by Honeywell for thirty years, including during the construction of LRHS. Busch would install thermostats, sensors, relay stations, fan control systems, and automatic temperature control devices. The work performed by Busch generally occurred at the end of construction, when "most of the job sites were pretty much

2

completed and finished." Busch alleged that he was exposed to asbestos at various job sites over the course of his career.[3]

W&G was a local insulation contractor that sold and installed insulation products, some but not all of which contained asbestos. For example, W&G sold and installed fiberglass and foamglass products, which did not contain asbestos. W&G petitioned for Chapter 11 bankruptcy protection in 1984. In 2002, WGAST was established pursuant to a reorganization plan and was approved by the United States Bankruptcy Court for the District of Maryland.

McCormick Asbestos Company ("McCormick"), since renamed MCIC, Inc., was another local insulation contractor and a competitor of W&G. MCIC was a party to the lawsuit below, but was dismissed by the plaintiffs one month before trial.

The specific construction project at which Busch asserts he was exposed to asbestos-containing products installed by W&G is the LRHS project. While employed by Honeywell, Busch worked on the construction of LRHS for three to four months in the late winter and early spring of 1972. Busch worked mostly in the school's boiler room, near two large fifteen-foot by twenty-foot boilers. Busch testified that during the time period that he was working in the boiler room, he was exposed to a "snow storm" of visible dust

---

[3] Busch initially alleged exposure at all of the sites listed above, including two residential projects when using asbestos-containing drywall joint-sealant product manufactured by Georgia-Pacific, LLC, but subsequently withdrew his allegations about the Edgewood Arsenal and USF&G projects.

3

created when blocks of insulation were cut, stacked around the boilers, and covered with cement.

The building specifications for LRHS required that magnesia blocks be used to insulate the boilers. Busch presented evidence at trial that, in 1972, magnesia block contained up to 15% asbestos by weight. Abatement records from the Baltimore County Public Schools were introduced to show that the block used to insulate boilers at LRHS contained asbestos. Additional evidence was presented to establish that the cement used to cover the magnesia block also contained asbestos.

Prior to trial, in response to interrogatories, Busch identified McCormick and Georgia-Pacific, LLC as the source of his asbestos exposure at LRHS. Specifically, Busch averred that during the construction of LRHS, he "worked with and around asbestos-containing thermal insulation products sold, supplied and installed by McCormick Asbestos Company (MCIC) and asbestos-containing joint compound manufactured, sold and supplied by Georgia-Pacific LLC." Busch also identified two witnesses with personal knowledge of his exposure in his interrogatory responses: Richard Huettel and Howard Sheppard. At his deposition, Busch testified that he did not know the employer of the insulators around whom he had worked at LRHS.

At trial, Busch testified that he did not have any recollection of who employed the insulators during the LRHS construction project. Huettel testified at trial that McCormick was the company responsible for insulation of the boilers at LRHS. Sheppard's 2007 deposition was presented as testimony at trial. Sheppard also testified that McCormick

4

employed the pipe insulators at LRHS. Neither Huettel nor Sheppard identified W&G as the party responsible for insulation in the boiler room at LRHS.

Other evidence was presented at trial to demonstrate that W&G performed insulation work at LRHS. A partial billing statement was sent by W&G to mechanical contractor Poole & Kent Co. ("Poole") for "Job #5679" on February 16, 1972. The document provided that W&G had "insulated various plumbing, heating and ventilating surfaces" at LRHS in connection with Job #5679. A second "partial billing" was sent on May 15, 1972 for work on the same project. The partial billings reflect that the value of Job #5679 was $145,250.00, but the invoices sent by W&G to Poole that were entered into evidence at trial totaled less than $20,000.00.

Time sheets for individual insulators employed by W&G for work performed at LRHS in association with Job #5679 were also admitted into evidence. The time sheets establish that W&G insulators worked at LRHS during the February - June 1972 time period. The time sheets indicate that W&G insulators worked on Job #5679 at LRHS for over 4,500 man-hours during that time period.

WGAST acknowledged at trial that W&G insulators performed work during the construction of LRHS, but contended that no evidence had been presented to show that W&G insulators worked with asbestos-containing products at LRHS. Invoices, order forms, and delivery ticket shipment records were introduced into evidence referencing "Foam Glass" pipe covering material, "FG PC" [fiberglass pipe covering material],

5

"Powerhouse cement," and "Glass Board FSK Facing." It was not disputed that "FG" is an abbreviation for fiberglass and that "Powerhouse cement" does not contain asbestos.

The construction specifications for LRHS required that piping be "insulated with one (1") thickness Fiberglass Standard PF sectional pipe covering." "Condensate return piping" was required to "be insulated with 3/4" thick low pressure Fiberglass with dual temperature jacket." Chilled water supply was to be insulated with "flexible foam plastic insulation." With respect to equipment insulation, the construction specifications provided that "[a]ll heating-ventilating and heating-air conditioning units shall be insulated with 1-1/2" fiberglass."

The only documentary evidence introduced directly connecting W&G to the boiler room was a "partial billing" for Job #5679 sent by W&G on February 16, 1972 to A.C. MacDonald, Inc., for work performed "to insulate fire lines in boiler room." The construction specifications for LRHS provided that "foamglass" insulation would be used for the insulation of fire lines. Neither fiberglass nor foamglass contain asbestos or cause mesothelioma.

The construction specifications required asbestos-containing insulation of the boilers themselves, providing that "[t]he boilers shall be insulated with 1-1/2" thickness Magnesia blocks, secured with hexagonal wire mesh and finished with two coats of asbestos cement troweled smooth." Indeed, Busch testified that he was exposed to dust when the block insulation and cement were installed during the insulation of the two boilers. No direct evidence was presented specifically connecting W&G to the supply

6

and/or installation of magnesia block insulation. Busch introduced evidence at trial to demonstrate that the sawing of magnesia insulation blocks in the boiler room was a contributing factor to Busch's mesothelioma.

Initially, Busch brought suit against seven defendants seeking damages for his occupational exposure to asbestos-containing products and subsequent development of mesothelioma. The case proceeded to trial against four defendants involving eight different worksites. By the close of the plaintiffs' case, only three defendants remained, and only two defendants remained by the close of evidence. The circuit court denied WGAST's motion for judgment at the end of the plaintiffs' case and renewed motion for judgment at the close of evidence.

The jury returned a verdict in favor of the plaintiffs against both defendants, WGAST and Georgia-Pacific. The jury found in the defendants' favor with respect to their cross-claims against two former defendants. The jury awarded the plaintiffs a total of $14,568,528.33 in damages,[4] which was subsequently reduced to $7,284,264.17 by the circuit court due to the cross-claims against the absent defendants. WGAST moved for JNOV, a new trial, and, in the alternative, remittitur. The circuit court denied WGAST's motions. WGAST noted a timely appeal. Georgia-Pacific noted an appeal as well, but subsequently settled with the plaintiffs.

---

[4] The jury awarded Busch $318,528.33 for past medical expenses, $1,250,000.00 for past and future economic loss, and $10,000,000 for non-economic losses. The jury further awarded Kathleen Busch $3,000,000.00 for loss of consortium.

Additional facts shall be discussed as necessitated by our discussion of the issues on appeal.

## DISCUSSION

## I.

WGAST first argues that the circuit court erred by denying its motion for judgment on the basis that Busch failed to present legally sufficient evidence to support a rational inference of causation. We review a trial court's decision to grant or deny a motion for judgment applying the *de novo* standard of review. *DeMuth v. Strong*, 205 Md. App. 521, 547 (2012). "In the trial of a civil action, if, from the evidence adduced that is most favorable to the plaintiff, a reasonable finder of fact could find the essential elements of the cause of action by a preponderance standard, the issue is for the jury to decide, and a motion for judgment should not be granted." *Id.* (citation omitted).

In an asbestos case, a plaintiff seeking recovery must show that his or her exposure to the asbestos-containing product was a substantial factor in the development of his injury. *See Eagle-Picher Industries, Inc. v. Balbos*, 326 Md. 179, 210 (1992). Busch, who worked in close proximity to insulation contractors but did not himself perform insulation work, is what the Court of Appeals has "termed a 'bystander,' in that he did not work directly with the asbestos products but was in the vicinity of where such products were used." *Owens-Corning Fiberglas Corp. v. Garrett*, 343 Md. 500, 526 (1996). A plaintiff seeking damages for exposure to asbestos as a bystander "must prove that [the appellees'] products were a substantial causative factor in his illness and ultimate death." *Id.* The Court of Appeals

8

set forth the "frequency, proximity, and regularity" test for substantial factor causation in *Balbos*, *supra*:

> Whether the exposure of any given bystander to any particular supplier's product will be legally sufficient to permit a finding of substantial-factor causation is fact specific to each case. The finding involves the interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace. This requires an understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and the bystander plaintiff. Within that context, the factors to be evaluated include *the nature of the product, the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff* to the use of that product.

326 Md. at 210-11 (citations omitted) (emphasis added). *Balbos* requires that the plaintiff prove (1) that the plaintiff was actually exposed to the defendant's asbestos-containing product, and (2) that the exposure was regular, proximate, and frequent. *Id.* A plaintiff is "required to present evidence of exposure to a '*specific product* [made or manufactured by the defendants] on a regular basis, over some extended period of time, *in proximity to where the [plaintiff] actually worked*.'") (emphasis in original) (quoting *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162-63 (4th Cir. 1986)).

Many of the facts of this case are not in dispute. Indeed, no party disputes the following:

- Busch worked on the LRHS site for multiple months.

- Busch worked primarily in the boiler room during the construction of LRHS.

9

- While in the boiler room, Busch was exposed to dust created when magnesia block insulation was cut.

- Magnesia block insulation was used to insulate the boilers at LRHS.

- The magnesia block insulation contained asbestos.

- The magnesia block insulation was coated with asbestos-containing cement.

- Busch ultimately developed mesothelioma.

- The asbestos-containing magnesia block and cement contributed to the development of Busch's mesothelioma.

WGAST's argument on appeal is quite narrow. WGAST argues that insufficient evidence was presented upon which a reasonable jury could conclude that W&G was responsible for the supply and/or installation of asbestos-containing magnesia block during the construction of LRHS.

Although WGAST focuses on the *Balbos* "frequency, regularity, proximity" test for substantial factor causation, this case is, at its core, about product identification, and the question before us is whether the evidence presented at trial was sufficient to support an inference that W&G installers installed asbestos-containing magnesia block in the boiler room at LRHS. Indeed, the parties agree that Busch frequently and regularly worked in close proximity to specific asbestos-containing products -- namely, magnesia block insulation in the LRHS boiler room.

WGAST asserts that the evidence produced at trial failed to place Busch near W&G installers using asbestos-containing materials. WGAST emphasizes that the documentary evidence presented does not expressly connect W&G to asbestos-containing products.

10

WGAST further points to documentary evidence demonstrating that W&G installers applied non-asbestos containing insulation (including foamglass and fiberglass) at LRHS. WGAST asserts that, because Busch did not present direct evidence that W&G supplied or installed magnesia block with asbestos cement on the boilers, the jury's verdict cannot stand. WGAST characterizes the jury's verdict as impermissibly speculative, arguing that Busch failed to prove actual, specific exposure to asbestos from W&G's product.

As we shall explain, the evidence, though slight, was sufficient to allow the case to go to the jury. In support of his assertion that W&G installed the magnesia block insulation in the boiler room at LRHS, Busch presented the following evidence:

- Time sheets demonstrating that W&G insulators worked on Job #5679 at LRHS for over 4,500 man-hours during the February - June 1972 time period.

- Partial billing statements sent by W&G to Poole for "Job #5679" on February 16, 1972 and May 15, 1972 indicating that W&G performed work associated with "insulat[ing] various plumbing, heating and ventilating surfaces" at LRHS. A second "partial billing" was sent on May 15, 1972 for work on the same project.

- The partial billings reflect that the value of Job #5679 was $145,250.00, but the invoices entered into evidence at trial totaled less than $20,000.00.

- A "partial billing" for Job #5679 sent by W&G on February 16, 1972 to A.C. MacDonald, Inc., for work performed by W&G in association with "insulat[ing] fire lines in boiler room."

In our view, this evidence could have led a reasonable fact-finder to conclude that W&G was the primary, if not the only, insulator working at LRHS during the critical time

11

period.  A reasonable fact-finder could have inferred that, given the significant number of hours W&G performed insulation services at LRHS, the services provided included the insulation of the boiler with magnesia block.  A fact-finder might have considered it unlikely that a separate insulation contractor would have been hired for the limited purpose of insulating the boilers while W&G was already on site performing a great deal of insulation work, including work in the boiler room.  This evidence does not necessarily compel a conclusion that W&G applied asbestos-containing insulation to the boiler in the boiler room at LRHS.  It is, however, evidence upon which a reasonable fact-finder could have found it *more likely than not* that W&G was responsible for the work.  This is all that is required under the preponderance of the evidence standard.

To be sure, such a conclusion would have required a fact-finder to make inferences based upon the evidence presented.  This is, certainly, a circumstantial evidence case.  "Circumstantial evidence of exposure will suffice" to support a jury's finding that a plaintiff was exposed to asbestos-containing materials.  *Scapa Dryer Fabrics, Inc. v. Saville*, 418 Md. 496, 511 (2011).  *See also Balbos*, *supra*, 326 Md. at 210 (1992) ("Exposure, however, may be established circumstantially.").  Circumstantial evidence "is not inherently insufficient [in a negligence case]; all that is necessary is that it amount to a reasonable likelihood or probability rather than a possibility." *Peterson v. Underwood*, 258 Md. 9, 17 (1970).  Here, based upon the evidence discussed *supra*, the jury was entitled to find that it was likely or probable that W&G performed the insulation work on the boilers

at LRHS, that Busch was exposed to asbestos dust while working the boiler room, and that, as a result, Busch developed mesothelioma.

In support of its assertion that the evidence presented in this case was too speculative to support the jury's verdict, WGAST points to the case of *Reiter v. Pneumo Abex, LLC*, 417 Md. 57 (2010). In *Reiter*, the Court of Appeals held that the plaintiffs failed to generate a jury issue when plaintiffs worked in a facility approximately "the size of an airplane hanger" but merely produced evidence that asbestos products had generally been used in the facility. *Id.* at 70. The Court explained that the plaintiffs were required to produce evidence of asbestos use "in proximity to where the decedents actually worked." *Id.* at 69. WGAST compares the large high school in this case to the large facility in Reiter. Critically, however, in the present case, Busch presented direct evidence of exposure to asbestos-containing products in the enclosed 40 ft. x 40 ft. boiler room at LRHS and circumstantial evidence to support a jury conclusion that W&G was the primary insulation contractor working at LRHS. This is not a case in which evidence was presented showing the general presence of asbestos-containing products at LRHS. Accordingly, we are unpersuaded by WGAST's attempts to analogize the facts of this case to *Reiter*.

Based upon the evidence presented at trial, a reasonable jury could have permissibly inferred that W&G was the primary, if not the only, insulation contractor present during the construction of LRHS, and, therefore, that W&G was responsible for the installation of asbestos-containing insulation in the boiler room. We hold that sufficient evidence was

13

produced to support this inference. We, therefore, hold that the circuit court did not err by denying WGAST's motions for judgment.[5]

## II.

In addition to arguing that the circuit court erred by denying its motion for judgment, WGAST raises four issues relating to evidentiary determinations and jury instructions. We address each of these issues in turn.

### A.      *Standard of Review for Evidentiary Determinations*

We generally review the trial court's evidentiary determinations for abuse of discretion. *Ruffin Hotel Corp. of Md. v. Gasper*, 418 Md. 594, 620 (2011). Nonetheless, "a trial judge does not have discretion to admit irrelevant evidence." *Id.* "While the 'clearly erroneous' standard of review is applicable to the trial judge's factual finding that an item of evidence does or does not have 'probative value,' the 'de novo' standard of review is applicable to the trial judge's conclusion of law that the evidence at issue is or is

---

[5] WGAST asserts that Busch should be bound by his sworn interrogatory statement identifying McCormick as the installer of the magnesia block insulation. The fact-finder was certainly permitted to consider Busch's prior identification of McCormick, but they were entitled to "believe or disbelieve, accredit or disregard, any evidence introduced . . . ." *Great Coastal Express, Inc. v. Schruefer*, 34 Md. App. 706, 725 (1977) (citations omitted).

Both parties devote portions of their briefs to discussion of certain records pertaining to W&G's work at LRHS that were not produced during discovery. Busch emphasizes that certain documents were produced right before the discovery deadline and highlights that no formal or informal agreements, contracts, or subcontracts for Job #5679 were produced or admitted into evidence. WGAST responds that any issue relating to discovery is waived, having not been raised before the circuit court. None of these issues are relevant to the determination of the issues on appeal, and we take no position as to any issues relating to discovery.

not 'of consequence to the determination of the action.'" *Id.* Relevant evidence is defined as evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401.

## B. Evidence Relating to McCormick's Dismissal

At trial, WGAST admitted into evidence various documents relating to the history of the current lawsuit as well as other asbestos litigation, including the plaintiffs' short form Complaint filed on April 11, 2016 and historical Baltimore City Asbestos Personal Injury Master Complaints and Amendments by Interlineation.[6] These exhibits identified for the jury all of the defendants initially named in Busch's initial Complaint, as well as all entities that had gone bankrupt over the prior twenty-five years and could not be named, and all parties who were thought by Busch to be responsible for contributing to the development of his mesothelioma at various stages of the litigation.

In response, Busch sought to admit the stipulation of dismissal for McCormick.[7] Busch argued that WGAST had implied to the jury that Busch "sued all these people because there was exposure to Mr. Busch from these defendants," and, particularly, to

---

[6] WGAST admitted the historical master Complaints dated July 10, 1987, April 4, 1989, June 20, 1990, November 12, 1990, February 5, 1991, February 27, 1991, and October 14, 1994.

[7] WGAST also sought to admit the circuit court's order granting summary judgment to McCormick, which was unopposed by Busch.

15

establish that McCormick was present at LRHS. WGAST objected to the admission of any

evidence relating to McCormick's dismissal on various grounds, including relevance.[8]

The circuit court responded that it "s[aw] a difference in terms of informing the jury

that these parties were dismissed and informing them as to how they were dismissed." The

court further explained:

> And I don't think that it would be appropriate to invite the jury
> to consider the substantive reasons or circumstances of their
> dismissal.
>
> But I think that it creates an unfair confusion regarding
> what happened when the defense has it -- has entered into the
> record the fact that these parties were sued, and to not tell the
> jury that these parties have now been dismissed I think creates
> confusion.
>
> I would say that I would find that the fact of dismissal
> without the underlying reasons for the dismissal would be
> admissible.

WGAST continued to express the reasons why it believed evidence relating to

McCormick's dismissal should not be conveyed to the jury. The circuit court further

explained:

> But you've put in the record the complaint identifying
> McCormick, and you're saying now in your argument that you
> have a defense of mistaken identity. But you have put in as
> evidentiary support of that defense the complaint by the
> plaintiff, and I think that that does open up questions for the
> jury as to what happened to that complaint.

\* \* \*

---

[8] WGAST also sought to preclude the plaintiffs from informing the jury about dismissed defendant Lloyd E. Mitchell. On appeal, WGAST focuses only on McCormick.

. . . I think you created room for explaining to the jury what happened to the complaint against McCormick.

Thereafter, the circuit court permitted Busch to inform the jury that McCormick had been dismissed from the lawsuit. The circuit court did not permit Busch to reference McCormick's unopposed motion for summary judgment or the court's order granting summary judgment.

We need not address whether the fact of McCormick's dismissal from the case would have been relevant absent the introduction into evidence of the short form Complaint and other historical asbestos litigation Complaints. Rather, we consider whether the circuit court erred by finding the fact of McCormick's dismissal relevant under the "opening the door" doctrine. The Court of Appeals has described the "opening the door doctrine as follows:

> The doctrine of "opening the door" to otherwise inadmissible evidence is based on principles of fairness. As we have stated: "'opening the door' is simply a way of saying: 'My opponent has injected an issue into the case, and I ought to be able to introduce evidence on that issue.'" *Clark v. State*, 332 Md. 77, 85, 629 A.2d 1239, 1243 (1993). It is a method by which we allow parties to "meet fire with fire," as they introduce otherwise inadmissible evidence in response to evidence put forth by the opposing side. *See Terry v. State*, 332 Md. 329, 337, 631 A.2d 424, 428 (1993). In this regard, the "*doctrine is really a rule of expanded relevancy*." *Clark*, 332 Md. at 84, 629 A.2d at 1242. It "authorizes admitting evidence which otherwise would have been irrelevant in order to respond to . . . admissible evidence which generates an issue." *Id.* at 84-85, 629 A.2d at 1243.

*Little v. Schneider*, 434 Md. 150, 157 (2013) (footnote omitted) (emphasis supplied). "The goal of the 'opening the door' doctrine is to balance any unfair prejudice one party might

17

have suffered." *Id.* at 170 n.6. The abuse of discretion standard applies when evaluating a trial court's decision to admit evidence pursuant to the "opening the door" doctrine. *Id.*at 170.

The quoted portions of the transcript above demonstrate that the circuit court carefully considered the evidence that had already been presented by WGAST and its potential to confuse the jury in a manner prejudicial to Busch. In an attempt to cure the potential confusion, the trial court permitted Busch to inform the jury that McCormick had been dismissed as a defendant. It was a reasonable determination for the trial court that WGAST, by informing the jury that McCormick had been sued by Busch, had injected an issue into the case that had the potential to confuse the jury as to McCormick's status. The circuit court, therefore, did not abuse its discretion by permitting Busch to inform the jury of McCormick's dismissal from the lawsuit to alleviate the confusion created by WGAST.

## C.    *Evidence of W&G's Insulation Work at LRHS*

WGAST further takes issue with the circuit court's admission of W&G documents pertaining to times when Busch was not working at the LRHS site, arguing that the admission of these documents was erroneous and prejudicial. WGAST asserts that information addressing times and places where Busch was not allegedly exposed was irrelevant and could have confused or misled the jury.

As discussed *supra*, Busch did not present direct evidence that he was exposed to asbestos-containing insulation installed by W&G at LRHS. Rather, this case involved circumstantial evidence to support an inference that W&G was the primary, if not the only,

18

insulation contractor for the LRHS project, and, therefore, that W&G was likely to have installed the asbestos-containing insulation in the boiler room. *See supra* Part I. In order to support this inference, Busch presented evidence of the significant amount of work performed by W&G at the site. Indeed, the extent of the work performed by W&G at LRHS was a significant issue presented at trial. During its opening statement, WGAST commented that W&G did "some work" at LRHS, but maintained that this was a case of mistaken identity in that McCormick was the insulation contractor responsible for the insulation of the boilers. Accordingly, we hold that evidence relating to work done by W&G at LRHS outside of the time frame that Busch worked at the site was relevant, and the circuit court did not err or abuse its discretion by admitting this evidence.

## D.    *Standard of Review for Jury Instructions*

Maryland Rule 4-325(c) provides that "[t]he court may, and at the request of any party shall, instruct the jury as to the applicable law[.]" "A Maryland appellate court reviews a trial court's refusal or giving of a jury instruction under the abuse of discretion standard." *Stabb v. State*, 423 Md. 454, 465 (2011). A proper exercise of discretion is "a sound judgment exercised with regard to what is right under the circumstances and without [acting] arbitrarily or capriciously." *Id.* (quotation omitted).

Appellate courts "consider the following factors when deciding whether a trial court abused its discretion in deciding whether to grant or deny a request for a particular jury instruction: (1) whether the requested instruction was a correct statement of the law; (2) whether it was applicable under the facts of the case; and (3) whether it was fairly covered

19

in the instructions actually given." *Id.* "The burden is on the complaining party to show both prejudice and error." *Tharp v. State*, 129 Md. App. 319, 329 (1999), *aff'd*, 362 Md. 77 (2000). "Where the decision or order [of the trial court] is a matter of discretion it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *Bazzle v. State*, 426 Md. 541, 549 (2012) (quotations and citations omitted).

### E.      WGAST's Proposed Fiber Drift Jury Instruction

WGAST requested that the circuit court instruct the jury that Maryland law rejects the fiber drift theory of liability for injury from exposure to asbestos. The Court of Appeals has defined fiber drift theory as follows:

> "The 'fiber drift theory' as it is described by the plaintiffs here takes as its starting point that asbestos fibers may become airborne or re-entrained and thus be carried from their source to other areas. Under this theory, however, both the specific locale of the product's use and the specific areas of the plaintiff's employment become irrelevant. The substance of the fiber drift theory is that once an asbestos-containing product can be placed anywhere in the Firestone plant, any plaintiff working at any point within that plant is entitled to have the question of causation submitted to the jury because it is likely, given that fibers can drift, that a given plaintiff was exposed to fibers originating in a particular defendant's product."

*Balbos*, *supra*, 326 Md. at 216-17 (1992) (quoting *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 376 (3d Cir.1990)). Fiber drift theory has been expressly rejected in Maryland. *Id.* at 217 ("So extremely attenuated is causation in fact under the 'fiber drift theory' that

20

it is inconsistent with the requirement of Maryland law that an actor's negligence be a substantial factor in causing the injury.").

Busch does not assert that fiber drift theory is consistent with Maryland law, nor does Busch argue that WGAST's proposed instruction would have been an inaccurate statement of law. Rather, Busch contends that the circuit court appropriately declined to propound the requested instruction because it was not generated by the evidence at trial.

We agree with Busch that the evidence did not support an instruction on fiber drift theory. Busch's theory of the case was premised upon his exposure to insulation contractors installing asbestos-containing magnesia block insulation in the boiler room. Busch testified that he spent approximately 70% of the three to four months he worked at LRHS in the boiler room. Busch did not claim that he was exposed to asbestos at LRHS other than in the boiler room. The parties' opening statements and closing arguments similarly focused on exposure in the boiler room only. For these reasons, WGAST's proposed jury instruction on fiber drift theory was not generated by the evidence. The circuit court, therefore, did not abuse its discretion by declining to propound the requested instruction.

**F.**     ***WGAST's Proposed Jury Instruction Relating to Interrogatory Responses and Statements in the Complaints***

WGAST's final appellate argument is that the circuit court erred in connection with its instruction to the jury about the evidentiary weight of Busch's interrogatory responses and statements in Busch's Complaints. WGAST submitted two requested jury instructions relating to interrogatories and the Complaints. WGAST's proposed instruction 8 provided:

During the course of trial you have heard reference made to the word "interrogatory." An interrogatory is a written question asked by one party of another, who must answer it in writing under oath. A party's answer to an interrogatory is considered an admission of the party and is substantive evidence of the facts admitted in that response. You are to consider interrogatories and the answers thereto the same as if the questions had been asked and answered under oath in court.

WGAST's proposed instruction 9 provided:

During trial of this case, Plaintiff's Complaints were admitted into evidence. Plaintiffs' Complaints are the documents that initiate the lawsuit. Statements in the Plaintiffs' Complaints are considered admissions of the party and are substantive evidence of the facts admitted in those documents.

Busch objected to the proposed instructions, asking "the [c]ourt to take it out entirely or change it." Counsel for Busch argued that the instruction was "confusing admission that gets it past hearsay with admissions under Rule 2-424, which are binding, but interrogatories are not." Counsel commented that "the correct language that I thought the [c]ourt adopted earlier is that an interrogatory is substantive evidence sworn, although not conclusive admissions of fact."

The circuit court responded, explaining:

Just to be transparent about it, there are lots of cases cited that set out law and standards, and such that are not directly related to a jury instruction.

So I think the problem is that when you say that something constitutes substantive evidence, that that means one thing[] to the lawyers who are reading the opinion. It may mean something else, and it may call into question for a jury what -- what is substantive evidence, versus all this other type of evidence, direct and circumstantial, et cetera.

22

> I think telling the jury something constitutes evidence or may be considered evidence is more consistent with the overall instructions, and I think reduces the risk of confusion.

The court thereafter propounded the requested instructions, with modifications. For clarity, the circuit court's modifications to the proposed instructions are in bold text below. With respect to interrogatories, the court instructed the jury as follows:

> During the course of the trial, you have heard reference made to the word "interrogatory." An interrogatory is a written question asked by one party of another who must answer it in writing under oath. A party's answer to an interrogatory is considered an admission of the party and **can be considered evidence** of the facts admitted in the response. You are to consider interrogatories and the answers thereto the same as if the questions had been asked and answered under oath in court.

With respect to Complaints, the court instructed:

> During the trial of this case, plaintiffs' complaints were admitted into evidence. Plaintiffs' complaints are the documents that initiate the lawsuit. Statements in the plaintiffs' complaints are considered admissions of the party and **can be considered evidence** of the facts admitted in those documents.

On appeal, WGAST asserts that the courts' instructions were "watered-down, incorrect statement[s] of law." WGAST contends that by changing the instruction to indicate that interrogatory responses and statements in the Complaints "can be considered evidence" rather than "are substantive evidence," the circuit court abused its discretion by indicating to the jury that it had discretion to ignore the interrogatory responses and statements in the complains as "non-evidence."

We are not persuaded by WGAST's assertions. The circuit court's statement that interrogatory responses and statements in Complaints *can be considered* evidence by the

23

jury is an accurate statement of the law, and the circuit court expressly explained why, in its view, the requested instructions were likely to cause the jury confusion. The circuit court's instruction informed the jury that the interrogatory responses and statements in the Complaints were certainly evidence for the jury's consideration, along with all of the other evidence presented at trial. The circuit court exercised its discretion when crafting an instruction very slightly different from the verbatim text proposed by WGAST. We will not disturb this exercise of discretion on appeal.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**